STATE OF NEBRASKA, EX REL. J. C. CRAWFORD, v. W. F. NORRIS.

FILED JUNE 29, 1893.    No. 5202.

1. **Constitutional Law**: INDIANS: NATURALIZATION.   The act of congress approved February 8, 1887, entitled "An act to provide for the allotment of lands in severalty to Indians on the various reservations and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes," is not in conflict with article 1, section 8, of the constitution of the United States, which provides that congress shall have power " to establish an uniform rule of naturalization."

2. **Indians**: ALLOTMENTS OF LAND UNDER FEDERAL LAW: CITIZENSHIP.   By the provisions of said act all Indians born within the territorial limits of the United States to whom allotments of land in severalty have been made under the provisions of said law, or other law or treaty, and all Indians, born as aforesaid, who have voluntarily taken up their residence in the United States separate and apart from any tribe of Indians therein, and adopted the habits of civilized life, are made citizens of the United States, and such Indians residing in this state are citizens thereof.

3. ——: ——: ——.   The actual issuance or receipt by an Indian of a patent for lands allotted to him under the act is not necessary to constitute him a citizen of the United States.. When he has accepted the land allotted, taken possession thereof and otherwise complied with the law, he becomes entitled to his patent and his citizenship attaches.

4. **Elections**: AUSTRALIAN BALLOT LAW: NOMINATIONS: REGULARITY OF CERTIFICATE.   An objection that the " convention," "primary meeting," " committee," or "electors" nominating a candidate for a public office had not the legal authority to make such nomination, must be made before the election and in the manner provided by section 136, chapter 26, of the Compiled Statutes ; and if not so made, the legal authority of such " convention," etc., to make such nomination—the certificate thereof being in an apparent conformity with the provisions of the election law—will, in the absence of fraud, be conclusively presumed.

5. ——: ——: ——: ——: OBJECTIONS TO FORM OF OFFI-

CIAL BALLOT. By the provisions of section 141, chapter 26, of the Compiled Statutes a candidate may make objections to the ballots as printed by the county clerk, and invoke the power of the courts to correct any error or omission in the name or description of his competitor; but if such candidate neglects to make such objection until after the election, he cannot then object to the result because of any error in the political designation of his competitor on said ballots, without a showing of fraud and that the error by deceiving the electors prevented a full and fair expression of the voters' will.

6. ———: ———: STATUTORY CONSTRUCTION. Such a construction of an election law as would result in the disfranchisement of large bodies of voters because of an error of some public officer should not be adopted where the language of the statute is susceptible of any other.

7. ———: ———: ———. Innocent irregularities of election officers which are free of fraud and have not prevented a free and fair expression of the popular choice will not vitiate the result of an election unless the legislature has expressly so declared.

ORIGINAL proceeding in nature of *quo warranto*.

*George H. Hastings, Attorney General, M. McLaughlin, W. E. Gantt, Barnes & Eames, W. F. Bryant,* and *J. C. Crawford,* for relator.

*Barnes & Tyler, Uriah Bruner, C. C. McNish,* and *Jay & Beck, contra.*

RAGAN, C.

This is an action of *quo warranto* brought by the relator J. C. Crawford against W. F. Norris, the present judge of the eighth judicial district. The material allegations of the information are: That at the general election held on the 3d day of November, 1891, in the eighth judicial district of the state of Nebraska, the whole number of votes cast for judge of the district court, as canvassed and returned by the board of canvassers, was 7,468, of which the defendant is alleged to have received 3,775 and the relator 3,693, and that upon the canvass of said votes said

State, ex rel. Crawford, v. Norris.

defendant had an apparent majority of 82 votes and was thereupon declared duly elected to said office and received a certificate of election to the same; that the county clerks of the counties of Cuming, Cedar, and Stanton caused the name of the defendant to be printed on the sample and official ballots as follows: "W. F. Norris, independent and republican," without authority and in direct violation of the law, as the said Norris had not been nominated by any convention or primary meeting representing a political party which at the last election before such convention cast one per centum of the vote polled in said judicial district; that at the last election held prior to said nomination there was no candidate voted for for any office in said judicial district representing the political party and designated on the ballots as "independent;" that 500 ballots were cast in said counties at the November election, 1891, for the said defendant, on which ballots he was designated as candidate for the "independent" party, which said 500 votes are part of the total of 3,775 votes cast and canvassed for the said defendant; that at the time of the holding of the convention aforesaid there was no party in said judicial district by the name of "independent," and the printing of the defendant's name on the ticket representing him as "independent" was calculated to and did deceive a large number of voters; that the county clerk of Thurston county caused the name of the defendant to be designated on the sample and official ballots as candidate for judge of said district as follows: "W. F. Norris, republican and independent," without the said defendant having been nominated by any convention representing any political party known or designated as "republican-independent;" that 293 of such ballots were cast in said Thurston county for the said defendant, and were canvassed and counted as a part of the said 3,775 votes alleged to have been received by said defendant; that the printing of the defendant's name on the ballots as aforesaid was calculated to deceive

the voters by making it appear that the defendant was the·
candidate and nominee of the "republican independent"
party, when in fact he was not; that the county clerk of
Dakota county caused the name of the defendant to be
printed on the sample and official ballots as follows: "W.
F. Norris, people's independent and republican," notwith-
standing there was no certificate on file in the office of said
clerk certifying that said Norris had been nominated by
any convention representing a political party by the name
of "people's independent;" that the printing of the de-
fendant's name on the ballots as aforesaid was calculated to
and did deceive the voters in said county by representing
that he was the candidate of the "people's independent"
party, when in fact he was not, and that 200 such votes
were cast, counted, and canvassed for said defendant in said
county as a part of said 3,775 votes alleged to have been
received by said defendant; that at said election there were
cast in Omaha precinct and Blackbird precinct in Thurs-
ton county 127 illegal votes, and that in Perry precinct
and in Winnebago precinct, in said Thurston county, there
were cast 206 illegal votes; that said illegal votes so cast
in said four precincts were cast by persons members of the
Omaha and Winnebago tribes of Indians, who were then
under the charge of, and in the care, custody, and control
of, an Indian agent, and that none of said Indians who
voted at said election in said four precincts were citizens of·
the United States or this state, and were not qualified
electors on the 3d day of November, 1891; that said.
Omaha and Blackbird precincts, in said Thurston county,
are a part and parcel of the Omaha Indian reservation, and
that the polling places where the said Omaha Indians
voted were located on said reservation; that said· Perry
and Winnebago precincts are a part and parcel of the
Winnebago reservation, and that the polling places where
said Winnebago Indians voted were located on said Win-
nebago Indian reservation.

The answer of the defendant, so far as we notice it, alleges: The defendant denied that the persons named in the relator's information as Indians were, at the time of the election, members of the Omaha and Winnebago tribes of Indians and averred the fact to be that there were then no such tribes of Indians, and that their tribal relations had been dissolved and that all of said persons so named in said information as Indians, and who voted in said Perry, Winnebago, Omaha, and Blackbird precincts in said Thurston county, were, on the 3d day of November, 1891, citizens of the United States and qualified voters of the state of Nebraska; that all of said Indians were born within the territorial limits of the United States, and on the 3d day of November, 1891, were male persons more than twenty-one years of age, and before said election each and every of said persons had severed his tribal relations and had adopted the habits of civilized life and lived separate and apart from any tribe of Indians, and each of said Indians before such election had applied for and had received his allotment of land in severalty, in accordance with an act of congress approved February 8, 1887, commonly known and called the "Dawes Bill;" that said defendant was duly nominated for district judge of the eighth judicial district of the state of Nebraska by the republican judicial convention of said district, as candidate for district judge at the election to be held November 3, 1891; that he was also nominated by the "independent judicial convention" of said district held at Wakefield, Nebraska, as candidate for judge of said district at said election; that certificates of each of said nominations, in due form of law, were duly filed in the office of the clerks of the several counties composing said judicial district, at the proper time before the election; that the clerks of the several counties embraced in said judicial district caused the official and sample ballots for said election to be printed and published in due form and at the proper time before the holding of said

State, ex rel. Crawford, v. Norris.

election; that said clerks, without fraud, and to the best of their knowledge and information placed the name of this defendant on said official and sample ballots as a candidate for office of district judge for both of said parties by which he was nominated; that said "independent judicial convention" and the persons who composed the same were the same persons and was the same party that, in the year 1890, under the name and style of "people's independent party" cast in said state of Nebraska some 68,000 votes, and in said eighth judicial district more than one per centum of the votes polled therein at the general election in said year; that all of these facts were well known to the said relator at the time and long before the said election held November 3, 1891; yet the said relator made no objection to the said certificates of nomination, or said official or sample ballots, but acquiesced in all of said proceedings with full knowledge thereof, and is now estopped to question the regularity or good faith of said proceedings. Defendant further averred that he received a large majority of the legal votes cast in said district for the office of district judge at the November election, 1891; that said election was lawfully and fairly conducted; that no voter in said district was deceived by anything which occurred in relation thereto, either before or at the holding of said election; that he lawfully and rightfully received the certificate of election and in due time entered upon his duties as judge.

We then have the following issues:

*a.* Whether the Indians of Omaha and Blackbird precincts, in Thurston county, who voted were electors.

*b.* Whether the Indians of Winnebago and Perry precincts, in said Thurston county, who voted were electors.

*c.* If these Indians were voters, should the ballots cast by them be rejected because the polling places at which they were cast were on lands in said Thurston county known as the Omaha and Winnebago Indian reservations?

*d.* Shall the ballots cast for the defendant on which he

was designated "W. F. Norris, republican-independent," be counted?

*e.* Shall the ballots cast for the defendant on which he was designated "W. F. Norris, republican, W. F. Norris, independent," be counted?

*f.* Shall the ballots cast for the defendant on which he was designated "W. F. Norris, republican, W. F. Norris, people's independent," be counted?

This cause was sent to a referee to take the evidence and report his findings of fact. He has done so, faithfully and carefully, but as both parties to this proceeding have filed exceptions to the referee's report, we have been compelled to read the entire testimony, and shall construe it without reference to the report of the referee, while cheerfully acknowledging the assistance the report has afforded us.

Were the Indians of Omaha and Blackbird precincts, in Thurston county, electors?

The record shows that the Indians who voted at the election in Omaha and Blackbird precincts in November, 1891, were male persons over twenty-one years of age, all born within the territorial limits of the United States and territories, and were born members of the Omaha tribe or nation of Indians; that each of said persons so voting had, before said election, taken his land in severalty; had taken possession thereof and received his patent therefor, in accordance with the terms of the act of congress approved February 8, 1887.

Article 7, section 1, of the constitution of this state provides that all male persons of the age of twenty-one years, or upwards, who have resided in the state six months, and who are citizens of the United States, shall be electors.

Section 6 of the act of congress approved February 8, 1887, provides: "And every Indian born within the territorial limits of the United States, to whom allotments (of land) shall have been made under the provisions of this

23

act, or under any law or treaty,   *   *   *   is hereby declared to be a citizen of the United States, and entitled to all 'the rights, privileges and immunities of such citizen."
· 'In *State, ex rel. Fair*, v. *Frazier*, 28 Neb., 438, it is said, in substance, that in order to establish an Indian's right to citizenship, and hence to vote at an election in this state, it must be proved that such Indian was born within the territorial limits of the United States, and that an allotment of land had in fact been made to such Indian by the government of the United States in pursuance of the act of congress above mentioned, or some other law or treaty.

The Indians, then, of Omaha and Blackbird precincts who voted at the election of November 3, 1891, were electors within the meaning of the constitution of the state, and the act of congress quoted above.

Were the Indians of Winnebago and Perry precincts, in Thurston county, voters?

The evidence in this record shows that the Indians who voted at the election held November 3, 1891, in Winnebago and Perry precincts were, at the time of said election, male persons over twenty-one years of age; that they were born within the territorial limits of the United States, and were born members of the Winnebago tribe of Indians; that each and every one of said Indians who voted had, before the election, selected and applied for his allotment of land in severalty under the terms of said act of congress; that each of the Indians so voting had taken possession of his land; that the special agent, appointed by the government for the allotting of lands to Indians, had allotted to each of said Indians, so voting, his land in severalty; had issued certificates to said Indians for such allotments and transmitted the schedules of said allotments to the secretary of the interior for his approval, but that at the date of the election the selection of land in severalty made by the Indians, and the allotment thereof made by the government, had not been formally approved, nor the patent issued

therefor. The evidence further shows that these Indians had voluntarily taken up their residences separate and apart from their tribes; that they had adopted the habits of civilized life; that they had severed their tribal relations.

Now, it is contended by the relator that these Winnebago Indians, although born within the territorial limits of the United States, and although they had selected their lands in severalty in compliance with the provisions of said act of congress, taken possession of said lands, and such selections had been approved by the agent of the United States appointed to make the allotments, the certificates of allotments had been issued to the beneficiaries, and such allotments certified to the secretary of the interior, yet because at the date of the election that officer had not formally approved of the allotments made, and the allottees had not actually received their patents for the lands allotted, they were therefore not entitled to vote. We do not so construe the act. By section 6 thereof it is provided: "And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act," etc., and section 3 of said act provides that the United States shall make the allotments through a special agent appointed by the president for the purpose, and when such allotments are made, certify the fact to the secretary of the interior, and upon his approval of the allotments made by the govenment, patents shall issue therefor. The part to be taken by the Indian in this proceeding is much like that taken by a man "taking up a homestead." He selects the land he wishes, and the local authorities of the government confirm or reject his selection. Now, these Winnebago Indians selected each his allotment of land in severalty under the terms of the act of congress and took possession of said lands. The special agent of the government made the allotments, issued the certificates therefor, reported his action to the

secretary of the interior, and recommended that patents
should issue for the lands so allotted.   These Indians had
done all required of them by law to entitle them to the
lands and to the right of citizenship.   It is undoubted
that if they possessed the qualifications required by the act
as to birth, etc., and complied on their part with the other
requirements of law, that the secretary of the interior has
no discretion in the matter, but must approve the allot-
ments made and the patents must issue therefor.   The pre-
sumption is that the special agent made no allotments to
any one not entitled thereto, and we will presume that all
Indians holding the certificates of allotment under the act
are entitled to their patents and therefore citizens and en-
titled to vote.   An Indian to whom an allotment has been
made under this act, and who possesses the other qualifica-
tions required by the constitution and laws of this state,
is *prima facie* a voter.   But the evidence in this record
shows, as before stated, that at the election held November
3, 1891, these Winnebago Indians who voted at such elec-
tion had severed their tribal relations, voluntarily taken
up their residences separate and apart from their tribes and
had adopted the habits of civilized life, and this brought
them within the last clause of section 6 of the aforesaid
act of congress.

The learned counsel for relator very truly say "that
the government of the United States is one of enumerated
powers, the national constitution being the instrument
which specifies them, and in which authority should be
found for the exercise of any power which the national
government assumes to possess," and then proceed to argue
that the act of congress known as the "Dawes bill" is
unconstitutional.   The claim is that it violates section 8,
article 1, of the constitution of the United States, which
provides that congress shall have power " to establish an
uniform rule of naturalization;" that the rule prescribed
by the law is not uniform.   The argument is very able and

very interesting, but we do not think that the act in question is in conflict with the constitution of the United States. Section 19, article 6, of the constitution of this state provides: "All laws relating to courts shall be general and have uniform operation." In the examination of a law passed by the legislature which was alleged to be in conflict with the above clause the supreme court of this state in *State, ex rel. Selden, v. Berka,* 20 Neb., 375, said: The constitutional provision last above quoted "is not violated by an enactment of a law limiting the number of justices of the peace in cities of the first-class to three, to be elected in districts to be created by the board of county commissioners of the counties in which such cities are situated. A law which is general and uniform throughout the state, operating alike upon all persons and localities of a class, or who are brought within the relations and circumstances provided for, is not objectionable as wanting uniformity of operation." The rule as thus announced was adhered to by this court in the *County of Lancaster v. Trimble,* 33 Neb., 121.

An analysis of the "Dawes bill" discloses that it prescribes a rule of naturalization only for Indians born within the territorial limits of the United States and for such of those, 1, to whom lands have been allotted in severalty, and 2, such as have voluntarily taken up their residence in the United States separate and apart from any tribe of Indians therein and adopted the habits of civilized life.

c. Are the votes cast by these Indians to be rejected because the polling places at which they were cast were located on their reservations?

Relator insists that neither the state of Nebraska nor the county of Thurston had any jurisdiction over these reservations; that the establishing of election precincts and holding elections thereon were illegal and the votes cast thereat should be thrown out.

In *Painter v. Ives*, 4 Neb., 128, it was said by Chief Justice LAKE: "It would seem clear that at the date of the state's admission into the Union every portion of the territory within the prescribed boundaries thereof, the Indian reservations included, became subject to its laws." We think this is correct. The county of Thurston, in which these reservations lie, is one of the duly organized political subdivisions of the state. The county authorities were invested by law with the duty of establishing voting places therein and of holding elections. The fact that one or more of the places of voting happened to be on an Indian reservation in the county, should not disfranchise the voters. That the title to these reservations is in the United States and the lands occupied by the Indians, sometimes denominated "wards of the nation," does not give the United States exclusive jurisdiction of the territory. The jurisdiction of the nation over the Indian in his tribal relation is supreme and exclusive; but when an Indian becomes a citizen of the United States within the provisions of the acts of congress, he becomes subject to the laws of the state of which he is a resident and entitled to the benefits of the laws of such state. The state also has jurisdiction over all the territory within its boundaries for the government and protection of its citizens and their property, and the enforcement of its laws.

*d.* Shall the ballots cast for the defendant on which he was designated "W. F. Norris, republican-independent," be counted?

*e.* Shall the ballots cast for the defendant on which he was designated "W. F. Norris, republican, W. F. Norris, independent," be counted?

*f.* Shall the ballots cast for the defendant on which he was designated "W. F. Norris, republican, W. F. Norris, people's independent," be counted?

We answer that all of said ballots were rightfully counted for the defendant and for the following reasons:

The record shows that the defendant was duly nominated by the republican convention as its candidate for the office of judge for the eighth judicial district; that he was also nominated by the independent convention held at Wakefield; that certificates of these nominations, in due form, were filed in the office of the county clerk for each of the counties composing said district for the length of time required by law before the election.

It was the duty of the county clerks in preparing the official ballots to place the defendant's name thereon as a candidate for each of the parties by which he was nominated. The clerks prepared the ballots without suggestions from either party to this proceeding and did so without fraud and with the most honest of intentions. The evidence also shows that there was no party by the name of "independent" which polled in said district one per centum of the votes cast therein at the election of 1890, but the evidence does show, if that is material, that the "people's independent" party and the "independent" party were one and the same. This court will also take judicial notice of the fact that the republican party and the people's independent party at the general election of 1890 each cast more than one per centum of the votes polled. The defendant was entitled to have his name appear on the ballots as candidate of each party nominating him. (*State, ex rel. Christy, v. Stein*, 35 Neb., 848; *Fisher v. Dudley*, 22 Atl. Rep. [Md.], 2; Wigmore's Australian Ballot Sys., 190; *Behrensmeyer v. Kreitz*, 26 N. E. Rep. [Ill.], 704; *State, ex rel. Hawes, v. Pierce*, 35 Wis., 93; *State, ex rel. Palmer, v. Stein*, 35 Neb., 866.) And all such ballots should be counted unless it appears the candidate was voted for more than once by the same elector.

By section 136, chapter 26, Compiled Statutes, it is provided that all certificates of nomination which are in apparent conformity with the provisions of the election law, shall be deemed valid, unless objection is made thereto in

three days after their being filed. And section 141 of the same act provides that whenever it shall be made to appear by affidavit that an error or omission has occurred in the name or description of a candidate nominated for office, or in the printing of the sample or official ballots, the county judge, or any judge of the district court at chambers, may, upon application of any voter, require the clerk to correct the error complained of, or show cause why it should not be corrected. Now, the certificates of the nomination of the defendant apparently conformed with the law, and the record before us does not disclose that the relator or any other elector, made any objection to such certificates. When these certificates were filed it was the duty of the county clerks in preparing the sample and official ballots, to designate the candidate on the same according to the certificates of nomination. It is conceded the clerks prepared the ballots without suggestion from either party; that there was no fraud practiced or intended. This record does not show, nor is the attempt made, that any elector was deceived by anything on the ballots, and the ballots show plainly that there were but two candidates for judge, the relator and the defendant. And for aught that appears every man voted for the candidate of his choice. Neither does the record show that the relator or any one else made any objection to the party designation, that is the description of the defendant as printed on the ballots before the election, and yet he asks us to disfranchise a thousand voters of the state because of an error, if it was an error, in the political description of the defendant.

The relator and defendant had a right to be voted for for an office and have the votes counted, even if the clerk had left off the ballot entirely the names of the political parties of which they were members and by which they were nominated. The statute requiring that the ballot shall contain the name of the party or principle which the candidate represents is directory and is intended as a help

and a guide to the voter, and it should be complied with, and the law denounces severe penalties against an officer who should unlawfully or fraudulently violate it; yet, as the voter has nothing to do with the preparation of the ballot, he cannot be deprived of the right to have his vote counted for the candidate of his choice because the ballot omits the candidate's correct political affiliation. (*Smith v. Harris*, 32 Pac. Rep. [Col.], 616; *Montgomery v. O'Dell*, 22 N. Y. S., 412; *State v. Saxon*, 12 So. Rep. [Fla.], 218; *Miller v. Pennoyer*, 31 Pac. Rep. [Ore.], 830; *State v. Barber*, 32 Pac. Rep. [Wyo.], 14; *State v. Van Camp*, 36 Neb., 91.)

"Innocent irregularities of election officers, which are free of fraud and have not prevented the free and fair expression of the popular choice, will not vitiate the result of an election unless the legislature has so expressly declared." (*Bowers v. Smith*, 17 S. W. Rep. [Mo.], 761.)

If the relator was dissatisfied with the political or other description of the defendant on the ballots as printed, he should have proceeded under section 141 of the election law, to have had the ballots corrected. Not having done this, his objection to these ballots, at this time, comes too late. (*Bowers v. Smith*, 17 S. W. Rep. [Mo.], 761; Id., 20 S. W. Rep. [Mo.], 101; *Allen v. Glynn*, 29 Pac. Rep. [Col.], 670.)

In the last case the supreme court of Colorado, through Chief Justice Hayt, say : "By other sections (of the Australian ballot law) it is provided that the name of every candidate whose name has been properly certified shall be on one and the same ballot; that sample ballots shall be in the county clerk's possession seven days before election, subject to public inspection, and official ballots four days before election. It is also provided for posting of sample ballots, etc. An examination of these sections will show that the legislature has made ample provision for the correction of ballots prior to the election; and it would

seem to be the duty of the candidate to make such objection in seasonable time. It is believed that it would not be in the interests of a fair expression of the will of the people to allow a candidate to lie by and not point out such objections as he may have to the form of the ballot until after the election has been held. If this be true, contestor should have spoken before the election. The fundamental object of all election laws is the freedom and purity of the ballot. It is to be observed that the voter has no control whatever over the publication of the names of candidates or the form of the ballots. If, for some defect in these particulars, the ballot must be rejected, the door would be open to fraud. To defeat the will of the people, it would only be necessary to have the county clerk furnish the electors, or some of them, with tickets slightly variant from those prescribed by law. It would seem to be the purpose of this section to give the opposing candidate ample opportunity to see that his opponent's name was not upon an unauthorized ticket, or under a device to the use of which he was not entitled. We do not think that those decisions which have been cited, holding that all provisions of the statutes are mandatory, and that ballots should be rejected that are not in all particulars in conformity to the requirements of the act, are entitled to much weight, in view of the provisions of this act. In order to make such decisions controlling, it should appear that the provision for objection and amendment was equally as liberal in those states as under our statute. It may be said that all provisions of such laws are mandatory in the same sense that they place a duty upon those who come within their terms. But it does not follow that an election should be invalidated because of every departure on the part of public officers from the terms of the act. We do not feel at liberty to place a narrow construction upon this act. To overthrow the expressed will of a large number of voters for no fault of theirs, as we are asked to do, would be to defeat the purpose

of all election laws, which is to obtain a full and fair expression of the wishes of the voters."

The application of the relator is denied and the suit dismissed at his cost, including fees of the referee herein, taxed at $100.

DISMISSED.

THE other commissioners concur.