## DRAPER *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MONTANA.

No. 496. Submitted October 23, 1896. — Decided November 30, 1896.

When the enabling act, admitting a State into the Union, contains no exclusion of jurisdiction as to crimes committed on an Indian reservation by others than Indians or against Indians, the state courts are vested with jurisdiction to try and punish such crimes. *United States* v. *McBratney*, 104 U. S. 621, to this point affirmed and followed.

The provision in the enabling act of Montana that the "Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States" does not affect the application of this general rule to the State of Montana.

THE case is stated in the opinion.

*Mr. J. W. Strevell*, for plaintiff in error, submitted on his brief. *Mr. S. A. Balliet* and *Mr. Lewis Penwell* were on the brief.

*Mr. Assistant Attorney General Dickinson* for defendants in error.

MR. JUSTICE WHITE delivered the opinion of the court.

The plaintiff in error was indicted, tried, convicted and sentenced to death for the crime of murder, alleged to have been committed on the Crow Indian reservation. He moved to arrest the judgment on the ground that the court had no jurisdiction to try an offence committed on the Crow reservation by other than an Indian, as such crime was exclusively cognizable by the proper court of the State of Montana. The refusal to arrest the judgment on account of this asserted want of jurisdiction is one of the errors pressed upon our attention, and our opinion on the subject will render it unnecessary to consider the other assignments.

The indictment does not state, nor does the record affirmatively show, that the accused and the deceased were negroes, but that fact is conceded both by counsel for the prisoner and the government, and upon such concession, the case as to jurisdiction was determined below, and is here presented for consideration. Irrespective, however, of the admission of counsel as to the race to which the accused and the deceased belonged, the question of jurisdiction arises on the record, since if, as matter of law, the reservation was not within the sole and exclusive jurisdiction of the United States, as the indictment fails to charge that the crime was committed by an Indian, it necessarily follows that if the court had jurisdiction only to punish such a crime the want of jurisdiction appears upon the face of the record. It is clear that if the accused was an Indian the court below had jurisdiction under the act of March 3, 1885, which, among other things, authorizes the punishment of any Indian committing the offence of murder within the boundaries of any State of the United States and within the limits of 'any Indian reservation, according to the laws and before the tribunals of the United States. *United States* v. *Kagama*, 118 U. S. 375. The assertion of jurisdiction in the courts of the United States over the crime of mur-

der perpetrated by one not an Indian against one not an Indian is based on the fact that the offence was committed on an Indian reservation. The contention as to want of jurisdiction rests upon the proposition that the Indian reservation being within the State, the courts of the State had alone cognizance of crimes therein done by other than Indians. To determine these conflicting contentions requires a brief examination of the legislation organizing the Territory of Montana and which provided for the admission of that State into the Union.

The Territory of Montana was organized by the act of May 26, 1864, c. 95, 13 Stat. 85. Subsequently, in 1868, the Crow Indian reservation was created, 15 Stat. 649, the land of which it was composed being wholly situated within the geographical boundaries of the Territory of Montana. The treaty creating this reservation contained no stipulation restricting the power of the United States to include the land, embraced within the reservation, in any State or Territory then existing or which might thereafter be created. The law to enable Montana and other States to be admitted into the Union was passed February 22, 1889, 25 Stat. 676, c. 180. This act embraced the usual provisions for a convention to frame a constitution, for the adoption of an ordinance directed to contain certain specified agreements, and provided that, upon the compliance with the ordained requirements, and the proclamation of the President so announcing, the State should be admitted on an equal footing with the original States. The question then is, has the State of Montana jurisdiction over offences committed within its geographical boundaries by persons not Indians or against Indians, or did the enabling act deprive the courts of the State of such jurisdiction of all offences committed on the Crow Indian reservation, thereby divesting the State *pro tanto* of equal authority and jurisdiction over its citizens, usually enjoyed by the other States of the Union?

In *United States* v. *McBratney*, 104 U. S. 621, this court held that where a State was admitted into the Union, and the enabling act contained no exclusion of jurisdiction as to crimes committed on an Indian reservation by others than

Indians or against Indians, the state courts were vested with jurisdiction to try and punish such crimes. The court there said:

"The act of March 3, 1875," c. 139 (the enabling act, which provided for the admission of the State of Colorado), "necessarily repeals the provisions of any prior statute, or of any existing treaty, which are clearly inconsistent therewith. *The Cherokee Tobacco*, 11 Wall. 616. Whenever, upon the admission of a State into the Union, Congress has intended to except out of it an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express words. *The Kansas Indians*, 5 Wall. 737; *United States* v. *Ward, supra.* The State of Colorado, by its admission into the Union by Congress, upon an equal footing with the original States in all respects whatever, without any such exception as had been made in the treaty with the Ute Indians and in the act establishing a territorial government, has acquired criminal jurisdiction over its own citizens and other white persons throughout the whole of the territory within its limits, including the Ute reservation, and that reservation is no longer within the sole and exclusive jurisdiction of the United States. The courts of the United States have, therefore, no jurisdiction to punish crimes within that reservation, unless so far as may be necessary to carry out such provisions of the treaty with the Ute Indians as remain in force. But that treaty contains no stipulation for the punishment of offences committed by white men against white men."

*United States* v. *McBratney* is therefore decisive of the question now before us, unless the enabling act of the State of Montana contained provisions taking that State out of the general rule and depriving its courts of the jurisdiction to them belonging and resulting from the very nature of the equality conferred on the State by virtue of its admission into the Union. Such exception is sought here to be evolved from certain provisions of the enabling act of Montana which were ratified by an ordinance of the convention which framed the constitution of that State. The provision relied on is as follows:

"Second. That the people inhabiting the said proposed State of Montana do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; that the lands belonging to citizens of the United States residing without the said State of Montana shall never be taxed at a higher rate than the lands belonging to residents thereof; that no taxes shall be imposed by the said State of Montana on lands or property therein belonging to or which may hereafter be purchased by the United States or reserved for its use. But nothing herein or in the ordinances herein provided for shall preclude the said State of Montana from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations and has obtained from the United States, or from any person, a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any act of Congress containing a provision exempting the lands thus granted from taxation, but said last-named lands shall be exempt from taxation by said State of Montana so long and to such extent as such act of Congress may prescribe."

The words in the foregoing provisions upon which the argument is based are the following: "And said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." This language has been considered in several cases in the courts of the United States with somewhat contradictory results. *United States* v. *Ewing*, 47 Fed. Rep. 809; *United States* v. *Partello*, 48 Fed. Rep. 670; *Truscott* v. *Hurlbut Land & Cattle Co.*, 73 Fed. Rep. 60.

As equality of statehood is the rule, the words relied on here to create an exception cannot be construed as doing so, if, by any reasonable meaning, they can be otherwise treated.

The mere reservation of jurisdiction and control by the United States of " Indian lands " does not of necessity signify a retention of jurisdiction in the United States to punish all offences committed on such lands by others than Indians or against Indians. It is argued that as the first portion of the section in which the language relied on is found, disclaims all right and title of the State to " the unappropriated public lands lying within the boundaries thereof and of all lands lying within said limits, owned or held by an Indian or Indian tribes, and until the title thereof shall be extinguished by the United States, the same shall be and remain subject to the disposition of the United States," therefore the subsequent words " and said lands shall remain under the absolute jurisdiction and control of the United States," are rendered purely tautological and meaningless, unless they signify something more than the reservation of authority of the United States over the lands themselves and the title thereto. This argument overlooks not only the particular action of Congress as to the Crow reservation, but also the state of the general law of the United States, as to Indian reservations, at the time of the admission of Montana into the Union.

On April 11, 1882, c. 74, 22 Stat. 42, Congress confirmed an agreement submitted by the Crow Indians for the sale of a portion of their reservation, and for the survey and division in severalty of the agricultural lands remaining in the reservation as thus reduced. The act, however, provided that the title to be acquired by the allottees was not to be subject to alienation, lease or incumbrance, either by voluntary conveyance of the grantee or his heirs, or by the judgment, order or decree of any court, but should remain inalienable and be not subject to taxation for the period of twenty-five years, and until such time thereafter as the President might see fit to remove the restriction.

The policy thus applied to the Crow reservation subsequently became the general method adopted by Congress to deal with Indian reservations. In February, 1887, by a general law, Congress provided " for the allotment of lands in severalty to Indians on the various reservations, and to extend the protec-

tion of the laws of the United States and the Territories over the Indians, and for other purposes." Act of February 8, 1887, c. 119, 24 Stat. 388. The act in question contemplated the gradual extinction of Indian reservations and Indian titles by the allotment of such lands to the Indians in severalty. It provided in section 6, "that upon the completion of said allotments and the patenting of said lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside." But the act at the same time put limitations and restrictions upon the power of the Indians to sell, encumber or deal with the lands thus to be allotted. Moreover, by section 4 of the act of 1887, Indians not residing on a reservation, or for whose tribe no reservation had been provided, were empowered to enter a designated quantity of unappropriated public land and to have patents therefor, the right, however, of such Indian to sell or encumber being regulated by provisions like those controlling allotments in severalty of lands comprised within a reservation. From these enactments it clearly follows that at the time of the admission of Montana into the Union, and the use in the enabling act of the restrictive words here relied upon, there was a condition of things provided for by the statute law of the United States, and contemplated to arise where the reservation of jurisdiction and control over the Indian lands would become essential to prevent any implication of the power of the State to frustrate the limitations imposed by the laws of the United States upon the title of lands once in an Indian reservation, but which had become extinct by allotment in severalty, and in which contingency the Indians themselves would have passed under the authority and control of the State.

It is also equally clear that the reservation of jurisdiction and control over the Indian lands was relevant to and is explicable by the provisions of section 4 of the act of 1887, which allowed non-reservation Indians to enter on and take patents for a certain designated quantity of public land. In-

deed, if the meaning of the words which reserved jurisdiction and control over Indian lands contended for by the defendant in error were true, then the State of Montana would not only be deprived of authority to punish offences committed by her own citizens upon Indian reservations, but would also have like want of authority for all offences committed by her own citizens upon such portion of the public domain, within her borders, as may have been appropriated and patented to an Indian under the terms of the act of 1887. The conclusion to which the contention leads is an efficient demonstration of its fallacy. It follows that a proper appreciation of the legislation as to Indians existing at the time of the passage of the enabling act by which the State of Montana was admitted into the Union adequately explains the use of the words relied upon and demonstrates that in reserving to the United States jurisdiction and control over Indian lands it was not intended to deprive that State of power to punish for crimes committed on a reservation or Indian lands by other than Indians or against Indians, and that a consideration of the whole subject fully answers the argument that the language used in the enabling act becomes meaningless unless it be construed as depriving the State of authority to it belonging in virtue of its existence as an equal member of the Union. Of course the construction of the enabling act here given is confined exclusively to the issue before us, and therefore involves in no way any of the questions fully reserved in *United States* v. *McBratney,* and which are also intended to be fully reserved here.

Our conclusion is that the Circuit Court of the United States for the District of Montana had no jurisdiction of the indictment, but, "according to the practice heretofore adopted in like cases, should deliver up the prisoner to the authorities of the State of Montana to be dealt with according to law." *United States* v. *McBratney, supra,* and authorities there cited.

*The judgment is reversed, and the cause remanded for proceedings in conformity to this opinion.*