372 P.2d 387

**Joe A. MONTOYA, Contestant-Appellant.**

**v.**

**Tom BOLACK, Contestee-Appellee.**

**No. 7103.**

Supreme Court of New Mexico.

June 5, 1962.

Concurring Opinion June 14, 1962.

Bigbee & Stephenson, Santiago E. Campos, Santa Fe, for appellant.

A. T. Hannett, Albuquerque, M. W. Hamilton, Robert E. Fox, Santa Fe, for appellee.

Willard F. Kitts, William C. Schaab, William A. Brophy, Albuquerque, for New Mexico Civil Liberties Union, amici curiae.

Arthur Lazarus, Jr., Strasser, Spiegelberg, Kampelman & McLaughlin, Daniel M. Singer, Joel R. Fiedelman, Washington, D. C., for Assn. on American Indian Affairs, Inc., amici curiae.

Norman M. Littell, Washington, D. C., Joseph F. McPherson, Walter F. Wolf, Jr., Window Rock, Ariz., for Navajo Tribe, amici curiae.

CARMODY, Justice.

We are called upon to determine if Navajo Indians residing on the reservation are eligible to vote. Part of the reservation is geographically within the exterior boundaries of the state of New Mexico, and the problem is whether such lands are politically and governmentally a part of the state so as to meet the constitutional requirement of "residence" for voting purposes.

The appellant was a candidate for the office of lieutenant governor in the 1960 general election. He contested on several grounds the result, which certified appellee as the winner, but the only basis pertinent on appeal is the challenge to the legality of some 2202 votes cast by persons (presumably Indians) residing and voting on the Navajo Reservation in San Juan and McKinley Counties, New Mexico.

The reason for the attack is made plain when it appears that appellee received a state-wide majority of 279 votes out of some 300,000, but if the contested votes were declared to be invalid, appellant would thereby gain 342 votes, making him the winner by 63 votes.

The trial court dismissed the notice of contest, on the ground that it failed to state a claim for relief, in effect holding that votes cast by Indians living on the reservation, at polling places on the reservation, were properly counted and canvassed.

Article VII, § 1, of the New Mexico Constitution, insofar as applicable, reads as follows:

"Every male citizen of the United States, who is over the age of twenty-one years, and has resided in New Mexico twelve months, in the county

ninety days, and in the precinct in which he offers to vote thirty days, next preceding the election, except idiots, insane persons, persons convicted of a felonious or infamous crime unless restored to political rights, and Indians not taxed, shall be qualified to vote at all elections for public officers. * * *"

Section 3-1-1, N.M.S.A., 1953 Comp., in addition to certain material not pertinent in this case, appears as follows:

"As used in this act, unless the context requires otherwise: The words 'qualified elector,' 'elector' or 'voter' means any citizen of the United States who at the date of the election will be over the age of twenty-one (21) years and will have resided in the state twelve (12) months, in the county ninety (90) days and in the precinct in which he offers to vote thirty (30) days, next preceding the election, except idiots, insane persons, persons convicted of a felonious or infamous crime unless restored to political rights.

"Residence within the meaning of the above paragraph shall be residence upon land privately owned, or owned by the state of New Mexico, any county or municipalities thereof; or upon lands originally belonging to the United States of America or ceded to the United States of America by the state of New Mexico, any county thereof, or any municipal corporation or private individual, by purchase, treaty or otherwise.

* * * * * *

"A person's residence shall be that place wherein he legally resides and has his domicile and from which when temporarily absent he intends to return."

However, the constitution and statute must be considered in the light of the treaty between the United States and the Navajo Indians, which was entered into in 1868 and appears at 15 Stat. 667, and contains the following provision:

"Article II. The United States agrees that the following district of country, to wit: bounded on the north by the 37th degree of north latitude, south by an east and west line passing through the site of old Fort Defiance, in Cañon Bonito, east by the parallel of longitude which, if prolonged south, would pass through old Fort Lyon, or the Ojo-de-oso, Bear Spring, and west by a parallel of longitude about 109° 30' west of Greenwich, provided it embraces the outlet of the Cañon-de-Chilly, which cañon is to be all included in this reservation, *shall be, and the same is hereby, set apart for the use and occupation of the Navajo tribe*

*of Indians,* and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit among them; and the United States agrees that no persons except those herein so authorized to do, and, except such officers, soldiers, agents, and employés of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article." (Emphasis added.)

In addition, the Constitution of New Mexico, art. XXI, § 2 (as well as § 2, paragraph Second of the Enabling Act for New Mexico (Act of June 20, 1910, ch. 310, 36 Stat. 557), which reads almost identically to the constitutional provision), is as follows:

"The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof, and to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through the United States, or any prior sovereignty; and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States; and that the lands and other property belonging to citizens of the United States residing without this state shall never be taxed at a higher rate than the lands and other property belonging to residents thereof; that no taxes shall be imposed by this state upon lands or property therein belonging to or which may hereafter be acquired by the United States or reserved for its use; but nothing herein shall preclude this state from taxing as other lands and property are taxed, any lands and other property outside of an Indian reservation, owned or held by any Indian, save and except such lands as have been granted or acquired as aforesaid, or as may be granted or confirmed to any Indian or Indians under any act of Congress; but all such lands shall be exempt from taxation by this state so long and to such extent as the Congress of the United States has prescribed or may hereafter prescribe."

There are several New Mexico cases which touch upon the immediate problem, but actually in none of them has this court

ever ruled upon the residence of treaty. Indians insofar as it concerns voting.

In Tenorio v. Tenorio, 1940, 44 N.M. 89, 98 P.2d 838, we held that residence within a pueblo reservation was a sufficient residence to give the court jurisdiction in granting a divorce between two pueblo Indians. Considerable doubt, however, has been cast upon this holding, in at least two very recent cases decided by us, namely, Your Food Stores, Inc. (NSL) v. Village of Espanola, 1961, 68 N.M. 327, 361 P.2d 950, and Valdez v. Johnson, 1961, 68 N.M. 476, 362 P.2d 1004, both of which will be discussed more fully hereinafter, together with State v. Begay, 1958, 63 N.M. 409, 320 P.2d 1017.

In 1948, the problem of Indian residence and right to vote was brought to this court in Tapia v. Lucero, 1948, 52 N.M. 200, 195 P.2d 621, but we remanded the case to the trial court for additional findings and, unfortunately, it was never thereafter decided on its merits.

During the above year, a case was filed in the United States District Court for the District of New Mexico, entitled Trujillo v. Garley, being No. 1350 on the docket of that court. Unfortunately, this case is not a reported case, and we have available only the transcript of the remarks made by the presiding judge of a three-judge district court. The issue in the Trujillo case, however, was apparently restricted and the final decision based upon the "Indians not taxed" provision appearing in art. VII, § 1, of the New Mexico Constitution. This case, incidentally, involved pueblo Indians as distinguished from treaty Indians, but the court ruled that the "Indians not taxed" provision was in violation of the Fourteenth Amendment of the Constitution of the United States and that the same was therefore invalid. As a result, the court directed that the plaintiff, an Indian, should be allowed to register to vote and the county clerk was enjoined from refusing such registration. This case was not appealed and has remained unquestioned in the subsequent years. There is no claim in the instant case as to this proposition, and we doubt if there would be any efficacy in our re-examining the problem. It is of interest to note in this respect that the New Mexico legislature, in 1953, some five years after the Trujillo case, amended § 3-1-1, N.M.S.A., 1953 Comp., which had formerly contained the same words as the constitutional provision, and eliminated the three words "Indians not taxed."

We should also mention in passing that there was another United States District Court case filed in 1948, entitled Bowman v. Lopez, No. 1391 on the docket of the United States District Court for the District of New Mexico. This case also, unfortunately, is not reported, but it is of interest, because therein the late revered Judge Colin Neblett directed the issuance

of an order requiring the county clerk of McKinley County to register all Navajo Indians and "not exclude them by reason of being residents on the Navajo Reservation." This case, also, was not appealed.

Counsel for appellee contend that the doctrine of stare decisis applies, particularly as regards the Bowman case, but we decline to so determine and will resolve the question on the basis of the law as we construe it, even though we do consider the Bowman decision as persuasive.

In State ex rel. Board of County Com'rs of Harding County v. Board of County Commissioners, 1954, 59 N.M. 9, 277 P.2d 960, this court determined that voting places must be in the precinct, and that votes cast in voting places outside the precinct would be void under the provisions of art. VII, § 1, N.M.Const. Also, in Wilson v. Wilson, 1954, 58 N.M. 411, 272 P.2d 319, we ruled that § 4 of art. VII, N.M.Const. (dealing with the elective franchise in the state) applied only to voting and was not applicable to a divorce proceeding.

On the same day that the ruling in Trujillo v. Garley, supra, was announced, this court announced its decision in Arledge v. Mabry, 1948, 52 N.M. 303, 197 P.2d 884. In that case, which is strongly relied upon by the appellant, and at least to some extent by the appellees and amici curiae, this court determined that persons residing on lands obtained by the United

States by the constitutional method (condemnation in that case with consent of the state) were not residents of New Mexico and therefore not entitled to vote. However, we also held that former public domain lands were not in the same classification as condemned lands and, absent legislative acts of cessation, the United States held them in a proprietary capacity only, thereby authorizing persons living thereon to satisfy the necessary residence requirement for voting. As applied to the instant case, certainly the reservation lands are not in the same category as lands obtained by the United States by purchase. In both Tenorio v. Tenorio, supra, and Arledge v. Mabry, supra, we noted the difference between lands obtained by the constitutional method and Indian lands. Further discussion is not necessary. However, there has been no change of ownership as occurs when the United States purchases or condemns lands and we do not believe that Arledge v. Mabry, supra, is authority for appellant's position.

State v. Begay, supra, in effect, held that a Navajo Indian could not be convicted in the state court for violations of the law while driving on a highway across the reservation, for the reason that an easement for highway purposes did not alter what was therein termed the "exclusive jurisdiction" of the United States government. Actually, this case need not have been put upon the "exclusive jurisdiction"

basis, at least to the extent attributed to it, inasmuch as it involved the trial of an Indian for a crime occurring on the reservation, and, without the consent of the Congress, the state had no jurisdiction, Donnelly v. United States, 1913, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820.

Your Food Stores, Inc. (NSL) v. Village of Espanola, supra, was intentionally limited, and merely determined that a municipality could not annex a portion of an Indian reservation without the consent of Congress. Annexation by a municipality of a part of a reservation and residence thereon for voting purposes are in no sense comparable, nor does the denial of the former imply the non-existence of the latter.

Valdez v. Johnson, supra, involved a suit between two Indians concerning an accident occurring within the limits of a pueblo and held, as do all of the authorities, that jurisdiction for self-government being reserved in the Indians, the state court did not have jurisdiction.

There are certain other New Mexico cases which are cited in the briefs, but we do not feel that they are of any assistance to us in a determination of this problem.

In other states, ordinarily under different constitutional provisions but with enabling acts similar to ours, it has been determined that Indians have the right to vote. Swift v. Leach, 1920, 45 N.D. 437, 178 N.W. 437; State ex rel. Crawford v. Norris, 1893, 37 Neb. 299, 55 N.W. 1086; and Harrison v. Laveen, 1948, 67 Ariz. 337, 196 P.2d 456. Also, it has been held that Indians living on reservations are residents of the state for the purpose of receiving welfare benefits. See, Acosta v. San Diego County, 1954, 126 Cal.App.2d 455, 272 P.2d 92; State ex rel. Williams v. Kemp, 1938, 106 Mont. 444, 78 P.2d 585; and State of Arizona ex rel. Arizona State Bd. of Public Welfare v. Hobby, 1954, 94 U.S.App.D.C. 170, 221 F.2d 498. The only jurisdiction which we feel is almost directly in point, inasmuch as it has the same enabling act as New Mexico, although the constitutional provision is different, is Arizona. In at least two cases, the Arizona Supreme Court has had occasion to consider this problem.

In Porter v. Hall, 1928, 34 Ariz. 308, 271 P. 411, the Arizona Supreme Court determined that, although members of an Indian tribe were residents of the State of Arizona within the constitutional provision requiring residence in the state, nevertheless Indians could not vote by reason of the fact that they were wards of the federal government and, as such, were "persons under guardianship" and thereby prohibited from voting in Arizona.

Subsequently, the Supreme Court of Arizona, in Harrison v. Laveen, supra, de-

clared that what perhaps was dicta in the Porter case was the law of Arizona, and that Indians were residents of the state for voting purposes. The court thereupon reversed the prior holding as to "persons under guardianship," and determined that Indians living on the reservation should in all respects be allowed the right to vote.

In the last analysis, although decisions from other courts may be persuasive, and particularly so with our sister state of Arizona, with which we have such close geographical and historical ties, the instant case must, of necessity, be determined to a large extent upon the pronouncements of the Supreme Court of the United States.

The history of the Indian problem, insofar as courts are concerned, commences with the case of Cherokee Nation v. State of Georgia, 1831, 5 Pet. 1, 30 U.S. 1, 8 L. Ed. 25, which was soon followed by the renouned case of Worcester v. State of Georgia, 1832, 6 Pet. 515, 31 U.S. 515, 8 L.Ed. 483. This latter case is either cited or discussed in almost every subsequent case involving Indian rights, even down to the present day. No further discussion is warranted at this time, and it should suffice to say that, if there had not been judicial encroachments upon the doctrine therein announced, there would be no problem before us today, because, as enunciated by Chief Justice Marshall, the lands of treaty Indians would never have been subjected to the laws of any state or territory. However, over the years there has been a gradual relaxation of the strict rule adopted in Worcester, as a result of which in many cases Indian reservations have been subjected to the jurisdiction of the surrounding state or territory. The power to tax property belonging to non-Indians on the reservation has been sustained by the Supreme Court (see, Utah & Northern Railway v. Fisher, 1885, 116 U.S. 28, 6 S. Ct. 246, 29 L.Ed. 542; Maricopa & Phoenix Railroad v. Arizona Territory, 1895, 156 U.S. 347, 15 S.Ct. 391, 39 L.Ed. 447; and Thomas v. Gay, 1898, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740). In Langford v. Monteith, 1880, 102 U.S. 145, 26 L.Ed. 53, it was held that process might be served on a reservation in a suit between two non-Indians in a territorial court. United States v. McBratney, 1881, 104 U.S. 621, 26 L.Ed. 869; Draper v. United States, 1896, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419; and New York ex rel. Ray v. Martin, 1946, 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261, held that the murder of one non-Indian by another was a matter for state law, even though the same occurred upon an Indian reservation. We would note in passing that in Draper v. United States, supra, the court was considering a treaty and an enabling act (Montana) almost identical to that with which we are here concerned.

Congress itself has recognized that the Indians must at some time become an integral part of the country and gradually be assimilated into society. Citizenship was granted by act of Congress in 1924 (Act of June 2, 1924, ch. 233, 43 Stat. 253). The states are authorized to enforce sanitation and quarantine laws on a reservation, to make inspections for health and educational purposes, and to enforce compulsory school attendance (Act of Feb. 15, 1929, ch. 216, 45 Stat. 1185, as amended 25 U.S.C.A. § 231). See, U. S. Department of Interior, Federal Indian Law (1958), at 126–127. In more or less recent years, several states have been permitted to assert criminal and, at times, civil jurisdiction over certain reservations (see, Act of June 30, 1948, ch. 759, 62 Stat. 1161; Act of July 2, 1948, ch. 809, 62 Stat. 1224, 25 U.S.C.A. § 232; Act of Sept. 13, 1950, ch. 947, 64 Stat. 845, 25 U.S.C.A. § 233; and Act of Oct. 5, 1949, ch. 603, 63 Stat. 705). By Act of Aug. 15, 1953, ch. 505, §§ 6 and 7, 67 Stat. 590, 28 U.S.C.A. § 1360 note, the Congress generally expressed its willingness to have any state assume jurisdiction over reservation Indians, provided the state legislature or the people voted affirmatively to accept such responsibility. It is recognized that, to date, New Mexico has not seen fit to accept this jurisdiction, but the statute is material, inasmuch as Congress has signified its intention that the time has come for the assimilation of the Indian into society with all the attributes of full-fledged citizenship.

Another very recent decision of the Supreme Court is that of Williams v. Lee, 1959, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed. 2d 251, which held that the state courts of Arizona had no jurisdiction over a civil action brought by a non-Indian against an Indian for merchandise sold on the Navajo Reservation. Of particular consequence in the Williams case is the court's ruling that the question of the applicability of the state law depends upon "whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." (Id. at 220, 79 S.Ct. at 271). Williams, when properly construed, is not authority for appellant's position, and, incidentally, it apparently approved Harrison v. Laveen, supra.

Since oral argument in this case, the Supreme Court has announced its decision in Organized Village of Kake v. Egan, 1962, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573, which we believe goes far to clarify the issues before us and to indicate the answer to our problem. In the unanimous opinion (one justice dissented on another point), the court, after reviewing many of its previous decisions, stated:

"These decisions indicate that even on reservations state laws may be applied to Indians unless such application

would interfere with reservation self-government or impair a right granted or reserved by federal law. * *"

Draper v. United States, supra, and Williams v. Lee, supra, both indicate that "absolute" federal jurisdiction is not invariably exclusive jurisdiction. In Organized Village of Kake v. Egan, supra, Mr. Justice Frankfurter compared the disclaimer portion of the Alaska Statehood Act to certain prior statehood acts, including the act admitting New Mexico, and stated that the Alaska Act, containing substantially identical language as used in past acts admitting states to the union, carried a settled meaning governing the jurisdiction of States over Indian property. In so doing, the court said:

"The disclaimer of right and title by the State was a disclaimer of *proprietary rather than governmental interest*." (Emphasis added.)

Thereafter, in the opinion, it is stated:
"* * * 'Absolute' * * * carried the gloss of its predecessor statutes, meaning undiminished, not exclusive. * * *"

▆ From all of the above, it is obvious that the Navajo Indian Reservation is not a completely separate entity existing outside of the political and governmental jurisdiction of the State of New Mexico. The state has some (and, we might say, considerable) jurisdiction, and there is not and

never has been what might be termed "exclusive federal authority."

▆▆ We are convinced that, for voting purposes, there is nothing in our constitution or in the statutes which prohibits an Indian from voting in a proper election, provided he fulfills the statutory requirements required of any other voter. This being true, there can be no question but that the reservation is a part of the state, and residence for voting purposes, within the meaning of art. VII, § 1, N.M.Const., follows. As a natural sequence, inasmuch as there is residence on the reservation for voting purposes, there is no prohibition to the location of polling places thereon.

▆ Appellant points out the difficulties that may arise in the event of a violation of a provision of the New Mexico Election Code occurring on the reservation, but such an argument is purely speculative. There is nothing in the notice of contest that shows there has been a violation of the election code requiring our consideration. The issue before us is solely that of residence and location of polling places on the reservation. We do not consider the possibility as to what may occur in the event of violations such as envisioned by appellant. It is our considered judgment that the granting of the right to vote and the location of polling places on the reservation in no way interferes with reservation self-government or impairs any right granted or

reserved by federal law. Therefore, so long as our constitution and laws do not prohibit voting on the reservation, or the placing of polling places thereon, the votes cast should be counted and canvassed, and we leave it to the legislature to determine, if it is deemed necessary, what policy should be followed as to any persons, not just Indians, who wish to participate in our elections, but who, for one reason or another, are not responsible to our officials or our laws. So, also, with respect to the location of polling places, legislative provision could be made to forestall any possible conflict as to jurisdiction between the state and tribal officials.

The seriousness of the problem, namely, that of allowing persons to elect officials to whom they owe no allegiance and whose laws or directions they are not bound to obey, is a matter for legislative consideration. The fact that a person living on a reservation may not be subject to the process of the courts or the directions of state or county officials is of serious moment, but so is the refusal of the right to vote.

Our sister state of Utah, under a statute which has since been repealed, refused to allow Indians to vote, on the basis of lack of residence (Allen v. Merrell, 1956, 6 Utah 2d 32, 305 P.2d 490). The repeal had the effect of permitting Indians to vote. However, after an amendment to another statute, relating to voting residence, the Supreme Court of Utah, in a case involving a resident of a military reservation, determined that it was within the prerogative of the state legislature to grant the right to vote, even though the federal government has "exclusive" jurisdiction (Rothfels v. Southworth, 1960, 11 Utah 2d 169, 356 P.2d 612). Although the holding in the Rothfels case may be contrary to Arledge v. Mabry, supra, we feel that certain language of the opinion expresses the proper view as to granting the right to vote. We do not mean to in anywise imply that any doubt is cast upon our holding in Arledge v. Mabry, supra, but we feel that the language of Chief Justice Crockett, speaking for the majority of the Utah court, is particularly applicable to the broad issue before us:

"* * * The right to vote and to actively participate in its processes is among the most precious of the privileges for which our democratic form of government was established. The history of the struggle of freedom-loving men to obtain and to maintain such rights is so well known that it is not necessary to dwell thereon. But we re-affirm the desirability and the importance, not only of permitting citizens to vote but of encouraging them to do so.

"* * * Accordingly, even if the statutes are not as clear in this regard as may be desired, doubts should be re-

solved in favor of the right to vote to the end that citizens may enjoy the full rights and privileges of citizenship."

We would add to the above that the right to vote should be coupled with the assumption of the burdens of citizenship. No person should be entitled to such a privilege, unless he is willing to assume the responsibilities that go with citizenship. The anomalous situation here existing places the Navajo in a more favored position than other legal residents of the state. They have the right to participate in the choice of officials, but, under many circumstances, cannot be governed by or be subject to the control of the officials so elected. Whether this should be allowed to continue is a matter to be determined by the legislature, after it has considered all of the facts including the wishes of the Indians involved. See, 67 Stat. 590, supra. See, also, U.S.Code Cong. & Ad.News 1953, p. 2409. Just as the constitution does not sanction first or second class citizens, neither does it provide that any one group, large or small, should have greater rights or responsibilities than others.

Appellant raises an additional question with respect to the use of paper ballots in certain precincts. However, it is admitted that, even if appellant is correct in his contention, there would not be a sufficient change in the total result to affect the election. Therefore, we do not deem it necessary to pass upon the question raised.

From what has been said, therefore, the judgment of the district court will be affirmed. It is so ordered.

CHAVEZ and MOISE, JJ., and LUIS E. ARMIJO, D. J., concur.

COMPTON, C. J., not participating.

NOBLE, Justice (specially concurring).

When the decision was filed in this case, I announced that while I joined in the opinion of the court I would file a specially concurring opinion. I join in the opinion filed except that I think the history of the Alaska Indians and the circumstances under which the disclaimer provision of the Alaska statehood act was enacted are so dissimilar from the history and circumstances surrounding the enactment of the disclaimer provisions of the New Mexico Enabling Act that the construction placed on the disclaimer provision of the Alaska act by Organized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573, is wholly inapplicable to our act.

The opinion of the court, in the instant case, quotes from Kake construing the statehood act to disclaim only a proprietary interest in Indian lands and property rather than a governmental interest. The question before the court, in Kake, was whether the State of Alaska could enforce its anti-fish-trap laws to prevent Indians from maintaining fish traps.

Differences in the language of the Alaska and New Mexico statehood acts; in the history of the Indians and Indian property in Alaska and New Mexico; and, the history of the congressional action regarding the two acts, show that the construction placed on the Alaska act in the Kake decision was intended to be limited to that act alone.

The Alaskan Indians were never in the hostile and isolated position of many of the tribes in other states, including the treaty Indians of New Mexico. There were never treaty Indians in Alaska, nor was there ever an attempt there to isolate them on reservations. For many years prior to Alaskan statehood, the Indians had substantially adopted and been adopted by the civilization of the territory. Alaskan Indians occupy important public offices in state government. Metlakatla Indian Community Annette Island Reserve v. Egan, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562. Justice Frankfurter in Metlakatla points out a further important distinction in the history of the Indians of Alaska as compared to the treaty Indians of other states, in saying:

"As early as 1886 a federal judge, holding Alaska Indians subject to the Thirteenth Amendment, denied that the principle of Indian National sovereignty enunciated in Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483, applied to them."

Furthermore, in Kake the court extensively detailed the discussions in congressional committee hearings on the Alaska statehood bill and said that these discussions afforded a basis for determining what was intended by Congress. In saying that the disclaimer by Alaska was a disclaimer of proprietary rather than of governmental interest, it will be noted the language is very similar to statements made in the hearings as to the meaning of the language. Moreover, it was there said that the act must be construed in the light of the history leading up to and the circumstances of the legislative enactment. That history and the history and situation of the Indians residing on reservations in New Mexico is so different that the construction of the disclaimer provision of the Alaska Act seems to me to be clearly distinguishable.

The construction placed on the Alaska statehood act in Organized Village of Kake v. Egan, supra, is not necessary to the decision reached by the court in the instant case. For all of the other reasons given in the opinion, I concur in the opinion of the court except I do not think that the construction placed on the disclaimer provision of the Alaska statehood act is controlling as to the disclaimer provision of the New Mexico Enabling Act.