[No. 11760.    Department One.    August 13, 1914.]

## SEATTLE, PORT ANGELES & LAKE CRESCENT RAILWAY, *Respondent*, v. PAUL LAND *et al.*, *Appellants.*[1]

EMINENT DOMAIN—PROCEEDINGS—REVIEW — APPEAL OR CERTIORARI. Since the questions arising on the preliminary hearing upon the questions of public use and necessity in condemnation proceedings by public service corporations are questions for the court from which there is no appeal, the method of review being by certiorari, appellants, having failed to review the preliminary order by certiorari, are foreclosed to object that there is no proof of respondent's corporate existence, that it is authorized to condemn the land, that it contemplates using the land for railroad purposes, or that it has paid its last annual corporate license.

APPEAL—REVIEW—HARMLESS ERROR—EVIDENCE.    Error cannot be predicated on the exclusion of evidence, where the testimony admitted covered everything included in the offer.

EVIDENCE—OPINION EVIDENCE—REAL ESTATE VALUES—COMPETENCY. Testimony of witnesses who were experienced real estate men though not experienced in the operation of gravel pits, is admissible in condemnation proceedings affecting a gravel pit upon the general question of value and damages.

EMINENT DOMAIN—DAMAGES—VALUE OF PROPERTY—MEASURE OF DAMAGES.    In condemnation proceedings for a right of way through land possessing little value except for deposits of sand and gravel thereon, the measure of damages to the land not taken is the market value as affected by the taking and not damages based on speculative profits from a gravel plant proposed to be installed at an indefinite future time.

SAME—DAMAGES TO LAND NOT TAKEN — EVIDENCE — SUFFICIENCY. In condemnation proceedings for a right of way through 40 acres of land chiefly valuable for its deposits of sand and gravel, findings of the court awarding the owners $250 for the land taken, but no damages for the land not taken, are sustained by the evidence of witnesses placing the value of the land at from $20 to $50 an acre, the property condemned being 2.79 acres, that the land was only valuable for its gravel deposits, and that the construction of the railroad would be a benefit rather than a damage to the land, although appellants' witnesses estimated the damage to the remaining land at from $3,000 to $4,000, which was twice the amount paid for the entire tract two years previously, and no showing was made that

[1]Reported in 142 Pac. 680.

gravel land had advanced in value in that time, all of appellants' evidence of damage being based on interference with, and loss of speculative profits from, a gravel plant which the owner deemed feasible and which he intended to install at some indefinite future time.

Appeal by defendants from a judgment of the superior court for Clallam county, Ralston, J., entered July 31, 1913, awarding damages in condemnation proceedings, after a trial to the court. Affirmed.

*Lyter & Folsom*, for appellants.

*Corwin S. Shank* and *H. C. Belt*, for respondent.

Ellis, J.—This is an appeal by the landowners from an award in condemnation. To avoid confusion, the parties will be designated throughout the condemnees as appellants and the condemner as respondent. The respondent sought to take a strip of land one hundred feet wide, containing 2.79 acres, for a railroad right of way through forty acres of land, in Clallam county, belonging to the appellants. The land was practically unimproved. Topographically, it is divided into two parts wholly unlike in character. Approximately, the east half is low bottom land cut up by overflow channels of Morse's creek. The west half, or a little more, rises in an abrupt bluff, at an angle of thirty-five degrees to forty degrees, to a height of about two hundred feet above the base of the bluff, where the right of way sought runs. The easterly low part is of little value except for use in connection with the west part, which is chiefly valuable for its gravel deposits, estimated to be about fifty feet deep on the top of the bluff, and supposed to cover the entire west part of the forty, or about twenty-five acres. The right of way enters the forty-acre tract at a point fifty or sixty feet east of the base of the bluff, extends in a southerly direction, touching, and necessitating a cut in the base of the bluff for a distance of something over two hundred feet, beginning at a point about two hundred feet from the north line of the forty-acre tract. From the cut, the

right of way runs near the base of the bluff to the south line of the tract, which it crosses at a point about one hundred and fifty feet east of the base of the bluff.

A preliminary finding of the corporate character of the respondent; that it sought the land for a public use; that the public interest required the prosecution of the enterprise, and directing that a jury be empaneled to determine the compensation, was regularly entered. On the trial of the issue of compensation and damages, a jury was waived, and the cause was tried to the court. The court awarded the appellants $250 as compensation for the land taken, but found no damages to the balance of the land by reason of the taking. The court incorporated in the judgment, with the consent of both parties, the following provisions:

"There is reserved to the respondents [appellants here], their heirs, executors, administrators and assigns, perpetual easements, rights and privileges (a) to construct and maintain and use over said lands chutes, sluice boxes and other necessary means of conveying sand and gravel from the hillside on the west side to the east side of the lands appropriated in this action; (b) to construct, maintain and operate such bunkers upon the westerly thirty-six (36) feet of the land appropriated in this action, as may by them be deemed needful in developing and working any sand and gravel pit or pits that may be developed and worked on land adjoining the west side of said land; (c) to construct, operate and maintain under said land such underground water pipes as may, by the respondents, their heirs, executors and assigns, be deemed needful in developing and working any such gravel pit aforesaid; provided, always, however, that the uses herein mentioned shall not interfere with the safety and practical operation of the petitioner's proposed line of railroad."

I. The first objection raised by appellants is that there is no proof that the respondent is a corporation, or that it is authorized to condemn the land, or that it in good faith contemplates building a railroad, or that it has paid its last annual corporate license.

The proceedings for condemnation by public service corporations are clearly defined by statute and well settled in practice. Upon petition and notice, a hearing is first had upon the questions of public use and necessity. This hearing necessarily involves the corporate capacity and the right to maintain the proceedings on the part of the petitioner as a public service corporation, the purpose for which the land is sought and its necessity for that purpose. Rem. & Bal. Code, § 925 (P. C. 171 § 176). These are questions for the court. From its decision thereon there is no appeal. *Western American Co. v. St. Ann. Co.*, 22 Wash. 158, 60 Pac. 158. A review of these questions can only be obtained by *certiorari*. *North Coast R. Co. v. Gentry*, 58 Wash. 80, 107 Pac. 1059; *Whatcom County v. Yellowkanim*, 48 Wash. 90, 92 Pac. 892. The only question reviewable on appeal is "the propriety and justness of the amount of damages." Rem. & Bal. Code, § 931 (P. C. 171 § 180a); *Fruitland Irr. Co. v. Smith*, 54 Wash. 185, 102 Pac. 1031; *State ex rel. Port Townsend Southern R. Co. v. Superior Court*, 44 Wash. 554, 87 Pac. 814. Having taken no action to review the preliminary order of the trial court by *certiorari*, the appellants here are foreclosed by the preliminary order as to all of the objections above mentioned.

II.   The appellants offered to prove by the appellant Paul Land a scheme or plan for the development commercially of the sand and gravel bank located to the west of the proposed railroad. It is claimed that the court should have admitted this evidence. The offer was as follows:

"We admit that there is no sand or gravel pit there now in operation, but offer to show by this witness that this is a sand and gravel bearing property and that it contains sand and gravel of commercial quality; that it is a quarter of a mile, approximately, from tide water, and that Mr. Land has prepared and had prior to this condemnation proceedings, a comprehensive scheme and plan for the development of this property—that he intended to construct a railroad at the foot

of the hill out to tide water, and there erect bunkers and shipping facilities, and that he had arranged for a right of way through the adjoining property for that purpose."

The court said:

"You may show the difference in value between the property as it now is and as it will be when this right of way has been taken and the railroad constructed by the petitioner. Mr. Land is an experienced sand and gravel man and should know the difference between the value of the land as it now is and as it will be after the railroad is constructed, and he should be able to explain this difference. The court will permit you to show the difference in value, if any, by the taking of this strip, to the balance of the forty."

Thereafter, the court permitted the appellant Land to testify as follows:

"I have computed the damage that will be sustained by the property not taken by virtue of the construction of this proposed railroad, and estimate the damage at not less than $4,000. . . . Prior to the time this suit was commenced, I took steps looking to the development of this particular property. I estimate the damage at four thousand dollars by the extra expense that I would be to, also the amount of gravel that I perhaps never could reach. They cut into the bank here and I could not get that out at all, except by crossing the railroad track, which would be a great big expense to me to develop that gravel property, to go across the track and put my bunkers on the east side of the track. It would be a big drawback all the way through. The proposed right of way goes so close to the foot of the hill that I would have no room for bunkers or switching facilities. I estimate it at about two and one-half million yards."

On cross-examination, he said:

"Some of this land is located about two thousand feet from tide water, some a little nearer. I would want to put two or three bunkers at the foot of the hill, maybe one hundred feet from the foot of the hill. I planned to put my bunkers perhaps two hundred feet north of my south line, somewhere near the shack. My gravel is located above the county road, and I would go under the road ten or twelve feet to get it

out.  I have not figured what it would cost to tunnel under the county road, nor have I figured the kind of bunkers, but I made tentative plans and estimated what they would cost. The receiving bunkers planned were seven hundred to eight hundred cubic yards capacity, and I figured on having two bunkers.  I also figured trestling, and on getting the gravel to tide water by putting on a gas engine and running two cars out on a railroad.  I figured it would be over a quarter of a mile from a point three hundred or four hundred feet north of my north line to tide water.  I figured on putting in a railroad to start on the side of the hill.  There is at least one per cent fall by the time I reach deep water and I could have a slight down grade all the way down.  I had arranged for a right of way through Mr. Morse's place, and to pay him sixty dollars per year."

It will thus be seen that the objection raised is hardly tenable.  The testimony admitted covered everything included in the offer.

III.  Finally, it is claimed that the court erred in not allowing any sum as damages to the land not taken.  On the question of damages, three witnesses, all experienced real estate men of Port Angeles, testified, placing the value of the land at sums ranging from $20 to $50 an acre, and that there would be no damage to the remainder of the land by the taking of the strip sought for a right of way.  While none of these men were experienced in the operation of gravel pits, we think their evidence was admissible on the general question of value and damages.  One of them had sold the west half of this land to the appellants about two years before, knowing at the time that it was being purchased for operation as a gravel pit.  Two other witnesses, contractors, both of long experience in the use of gravel, though not in the operation of gravel pits, testified that they had examined this land with especial reference to the quality of gravel, and gave it as their opinion that the sand and gravel was so mixed with clay that it would be very expensive to operate as a gravel plant.  They gave it as their opinion that the construction of a railroad running to Port Angeles

on the right of way sought would be a distinct benefit rather than a damage to the land as a gravel bearing property, since it would furnish transportation for the product.

The only witness who testified for the appellants as to the value of the land was the appellant Paul Land himself. He testified that the land is four miles from Port Angeles, has little or no value except for its gravel, and that the value of the whole forty is $12,000 to $15,000; that he bought all of the land about two years ago for $2,000, the west half, that possessing the chief value as gravel property, for $1,000. There was no evidence whatever to show that gravel land in particular has advanced in value during the last two years. In fact, the appellant Land testified that the dullness of the market is the reason he has not already developed this property. It is difficult to see whence comes the immense increase in value of this property from $2,000 two years ago, the west half then having been purchased as gravel land for $1,000, to $12,000 or $15,000 at the time of trial. It is only fair to the appellant to say that he was not asked, and did not pretend to say, that this figure was its market value, his evidence, taken as a whole, only implying that this was its value to him—a very different thing. Market value is always the true criterion; market value, it is true, as enhanced by the most profitable use to which the property can be put, but still market value is the only safe and just guide. Otherwise the court would be bound by any fanciful value the owner might put upon his property for use in some scheme of his own, though the scheme might be too speculative and hazardous to add any value to the land in the real estate market, even with a buyer ready and able to buy, but not compelled to buy, and a seller willing to sell, but not compelled to sell, which conditions, on all authority, fix market value. If land has a peculiar value for some determinate purpose, testimony to that effect is admissible even though it be not then used for that purpose, and there be no present intention to use it for that purpose. *Louis-*

*ville, N. O. & T. R. Co. v. Ryan,* 64 Miss. 399, 8 South. 173. Such testimony, however, can only be considered when it is shown that the potential use may be reasonably expected to be realized in the immediate or near future.

"So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future." *Boom Co. v. Patterson,* 98 U. S. 403.

See, also, *Calumet River R. Co. v. Moore,* 124 Ill. 329, 15 N. E. 764. Such adaptability to some peculiar use is only admissible as affecting the present market value of the land as land. The true rule is thus expressed by a discriminating text writer:

"It is said in some cases that it is proper to consider every element of value which would be taken into consideration in a sale between private parties. But this needs some qualification, since remote and speculative reasons are often urged by the seller in support of the valuation claimed. Some cases say that the owner is entitled to the value of the property for the highest and best use to which it is adapted. This is true in so far as such adaptation affords the market value. But the proper inquiry is, not what is the value of the property for the particular use, but what is it worth in the market, in view of its adaptation for that and other uses." Lewis, Eminent Domain (3d ed.), pp. 1232, 1233, § 706.

The same considerations applicable to the assessment of compensation for the land actually taken apply with equal force to the assessment of damages to the remaining land, occasioned by the taking. In all such cases, the limit to the inquiry as to the possible future uses of the land as affecting value is left, to some extent, to the discretion of the trial

court. *Fales v. Inhabitants of Easthampton,* 162 Mass.
422, 38 N. E. 1129; *Providence & W. R. Co. v. Worcester,*
155 Mass. 35, 29 N. E. 56. Any other rule would, in nearly
every case, compel the court to permit unlimited excursions
into remote collateral and speculative issues confusing to the
real question of present market value.

On the issue of damages to the remaining land, the evi-
dence on behalf of the appellants was, as will be noted by
our quotation from the testimony of Mr. Land himself, di-
rected to showing an injury to the appellants in their bus-
iness plans, looking to the construction at some future time
of sluices, screens, and bunkers, the latter to be located at
a point at the foot of the bluff, somewhere within the pro-
posed right of way, or so near it as to be interfered with by
the respondent's railroad, it being intended to use these facili-
ties in connection with a railroad or tramway running to tide
water, about two thousand feet distant, on the shore of the
Strait of Juan de Fuca, where the appellants intended to
construct a wharf for their own use. The appellants' chief
witness besides Mr. Land himself testified that the respond-
ent's railroad would be a benefit rather than an injury to the
appellants' land were it not for the fact that it might inter-
fere with the appellants' proposed plant when he desired to
construct it in the future. The appellant Land testified, "I
have computed the damage" and "estimate the damage at
not less than $4,000." Nowhere did he say that the basis of
computation was the market value of the land or that the
estimate of the amount of damage was measured by the re-
duced market value of his land even as first class gravel prop-
erty. On the contrary, his estimate was clearly what he con-
ceived to be its diminished value to him personally, based up-
on the diminished anticipated profits resulting from an estimat-
ed increased cost of production of gravel by a plan or system
which he estimated would be feasible, and profitable if ever
put into operation. His chief witness, using the same basis,
estimated the damages to the remaining land at $3,000 to

$4,000. This was not a correct basis for the estimation of damages in condemnation, in which, it is elementary, that the criterion for damages is the effect on the market value of the remaining land, not the loss of speculative profits on a business which might be conducted at some future time on the land. As said in *Providence & W. R. Co. v. Worcester, supra:*

"The subject of inquiry by the jury was primarily, not the value of gravel but of land. The price, the cost of hauling, and the demand and supply of an article of merchandise, which may or may not be wrought out of the land by labor which must necessarily be continued for some considerable length of time, during which the care and management of the property and the expense of holding it are uncertain but important elements in the value of the commodity when it reaches a market, cannot be said, as matter of law, to be so decisive of the value of the land as to make them in all cases competent evidence."

The damages in the large sums testified to by appellant Land and his principal witness are shown by their evidence to be based upon reduced profits, which must, of course, be dependent upon the demand and the market price of gravel for years to come. The increased cost of production which, it is claimed, would be occasioned by the construction of the respondent's road was computed by these witnesses at one cent to a cent and a half on every yard of the estimated 2,500,000 cubic yards of gravel in the entire tract. This so figured, the appellants say in their brief, would be $2,500 to $3,750, or approximately the damages claimed. As a matter of fact, the damages so computed would be ten times those amounts. It would be $25,000 to $37,500, or from two to three times the entire value of the land even at the extravagant figure stated by appellant Land.

It is, of course, absurd to say that the damage caused by the taking of a strip of one hundred feet through a forty-acre tract is several times the value of the entire tract, yet this mode of figuring is the only justification offered as the

basis of appellants' claim of any damage in any definite amount. It serves to illustrate the propriety, not to say the absolute necessity, of the rule limiting the damages to market value and reduced market value in every case. This being the only evidence of a reduced value, neither the trial court nor this court has any competent evidence of a reduced market value; hence, no evidence of a recoverable damage for injury to the remaining land. We deem it unnecessary to further review the evidence as to the damages. It was all directed to this same theory of interference with, and loss of speculative profits from, a gravel plant which the appellants expected, at some indefinite future time, to install. It was all extremely speculative, and while some of the things testified to might affect the market value of the land as land, there is absolutely no competent evidence that it would do so, or if so, to what extent.

We deem it a sound rule that damages cannot be awarded in reference solely to the particular situation, circumstances, or plans of the owner, or to the business in which he happens to be engaged, but only with reference to the uses to which the land, considered as property, may be put as affecting its present market value. *Fales v. Inhabitants of Easthampton, supra.* The reservations in the judgment met every reasonable requirement sustained by competent evidence.

The judgment is affirmed.

CROW, C. J., CHADWICK, GOSE, and MAIN, JJ., concur.