[No. 27625. Department Two. April 23, 1940.]

NEAH BAY FISH COMPANY, *Appellant,* v. B. U. KRUMMEL *et al., Respondents.*

W. W. WASHBURN, JR., *et al., Appellants,* v. B. U. KRUMMEL *et al., Respondents.*

NEAH BAY DOCK COMPANY, *Appellant,* v. B. U. KRUMMEL *et al., Respondents.*[1]

*Trumbull, Severyns & Trumbull* and *Thos. N. Nelson,* for appellants.

*The Attorney General* and *T. H. Little, Assistant,* for respondents.

[1] Reported in 101 P. (2d) 600.

GERAGHTY, J.—Neah Bay Fish Company and Neah Bay Dock Company, both Washington corporations, and W. W. Washburn, Jr., and Walter E. Baker, co-partners doing business as LaPush Ocean Beach Resort, conducting business solely within the Makah Indian reservation under authority and license from the United States commissioner of Indian affairs and the Makah tribe of Indians, instituted separate actions to enjoin the collection of the Washington state business and occupation tax (Laws of 1933, chapter 191, p. 869, and amendments) and sales tax (Laws of 1935, chapter 180, p. 706, and amendments) for business done with, and sales made to, persons other than Indians. Following a consolidation of these cases and trial upon stipulated facts, the superior court dismissed the complaint with prejudice. This appeal follows the denial of motions for a new trial.

The appellants' first contention is that, while the Makah Indian reservation is within the boundaries of the state of Washington, it is, in effect, without the state in both a jurisdictional and territorial sense; in other words, that it is, as was said of the Fort Lewis military reservation in *Concessions Co. v. Morris*, 109 Wash. 46, 51, 186 Pac. 655, "an independent sovereignty the territory of which is surrounded by the state of Washington, but over which the state of Washington has no jurisdiction."

What the status of the Makah reservation is, in respect of the state's jurisdiction, is to be determined from a consideration of the organic law of the territory, the treaty between the Makah Indians and the United States, the enabling act for admission of the state into the Union, and the provisions of the constitution adopted in accordance with the enabling act. The following principle is stated in 31 C. J. 531, § 115:

"It does not follow because the authority of the federal government over the Indians and the Indian country is supreme that the state and territorial governments have no jurisdiction whatever over them. In the absence of provisions to the contrary, the lands embraced therein occupied by Indian tribes are a part of the state or territory and subject to its jurisdiction, except so far as concerns the government and protection of the Indians themselves, and for purposes relating to the treaties and agreements between the United States and the Indians, in which respects the jurisdiction of the United States is exclusive. But where such reservations are expressly excluded from the limits or jurisdiction of the state or territory, the state or territorial governments have no jurisdiction therein."

In *Langford v. Montieth*, 102 U. S. 145, 26 L. Ed. 53, the question of the jurisdiction of the territorial courts within the Nez Percé Indian reservation in Idaho territory was in issue. The court stated the principle to be sound that,

"When, by the act of Congress organizing a territorial government, lands are excepted out of the jurisdiction of the government thus brought into existence, they constitute no part of such Territory, although they are included within its boundaries. Congress, from which the power to exercise the new jurisdiction emanates, has undoubtedly authority to exclude therefrom any part of the soil of the United States, or of that whereto the Indians have the possessory title, when, by our solemn treaties with them, a stipulation to that effect has been made."

Continuing, the court adverted to the fact that Congress had sometimes acted on this principle on the admission of new states into the Union, and cited, as illustrative, the act for the admission of Kansas (12 Stat. 126), which, after describing the exterior boundaries of the new state and declaring that it was to be admitted into the Union on an equal footing with the original states, in all respects whatsoever, provided

that nothing contained in its constitution should be construed

" '. . . to include any territory which by treaty with such Indian tribe is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any State or Territory; but all such territory shall be excepted out of the boundaries and constitute no part of the State of Kansas, until said tribe shall signify their assent to the President of the United States to be included within said State.' "

By the terms of a treaty existing between the United States and the Shawnees, it was guaranteed that the lands of these Indians should never be brought within the bounds of any state or territory, or subject to the laws thereof, without their consent; and it had been held that, by reason of this treaty and the provisions in the enabling act, the courts of Kansas had no jurisdiction in the lands of the Shawnees. *United States v. Ward,* 1 Woolw. 17, 28 Fed. Cas. 397, and *United States v. Stahl,* Id. 192, 27 Fed. Cas. 1288.

The organic act of Idaho territory (12 Stat. 808) contained a clause similar to that found in the act admitting Kansas into the Union, and, in *Harkness v. Hyde,* 98 U. S. 476, 25 L. Ed. 237, it had been held that the jurisdiction of the territorial courts did not extend over the reservation of the Shoshones in Idaho. Commenting on the case, the court, in *Langford v. Montieth,* p. 147, said:

"This court, in *Harkness v. Hyde (supra),* relying upon an imperfect extract found in the brief of counsel, inadvertently inferred that the treaty with the Shoshones, like that with the Shawnees, contains a clause excluding the lands of the tribe from territorial or State jurisdiction. In this it seems we were laboring under a mistake. Where no such clause or language equivalent to it is found in a treaty with Indians within the exterior limits of Idaho, the lands held by them are a part of the Territory and subject to its jurisdic-

tion, so that process may run there, however the Indians themselves may be exempt from that jurisdiction. As there is no such treaty with the Nez Percé tribe, on whose reservation the premises in dispute are situated, and as this is a suit between white men, citizens of the United States, the justice of the peace had jurisdiction of the parties, if the subject-matter was one of which he could take cognizance."

The act of Congress establishing the territory of Washington, approved March 2, 1853 (10 Stat. 172), reserved to the Federal government authority

". . . to make any regulation respecting the Indians of said Territory, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent to the government to make if this act had never been passed: . . . "

There was no provision in the act for the exclusion from the territory of any Indian reservations thereafter established; none, of course, then existed.

The Makah treaty, made January 31, 1855 (12 Stat. 939), after outlining the boundaries of their reservation, provides:

". . . which said tract shall be set apart, and so far as necessary surveyed and marked out for their exclusive use; nor shall any white man be permitted to reside upon the same without permission of the said tribe and of the superintendent or agent; . . . "

There is here no stipulation that the reservation was not to remain part of the then existing territory of Washington.

As first organized, Washington territory extended eastward to the summit of the Rocky Mountains and embraced the country of the Nez Percé Indians. The treaty with that tribe for the establishment of their reservation, referred to in *Langford v. Monteith, supra,* was made by Governor Stevens June 11, 1855, and embodied the following provisions (12 Stat. 957, 958):

"All which tract shall be set apart, and, so far as necessary, surveyed and marked out for the exclusive use and benefit of said tribe as an Indian reservation; nor shall any white man, excepting those in the employment of the Indian department, be permitted to reside upon said reservation without permission of the tribe and the superintendent and agent; . . . "

It is seen that, while there is a slight verbal difference, the import of the language employed in both treaties, with respect to the status of the reservation, is the same.

The states of Washington, Montana, and the two Dakotas were admitted into the Union by the same enabling act (25 Stat. 676). This act does not provide for the exclusion from the territory to be embraced within the new states of Indian reservations, but it does require that the constitutional conventions provide, by ordinances irrevocable,

"That the people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; . . . "

In *Draper v. United States,* 164 U. S. 240, 41 L. Ed. 419, 17 S. Ct. 107, the plaintiff in error had been indicted, tried, convicted, and sentenced to death by the circuit court of the United States for the district of Montana, for the crime of murder, alleged to have been committed on the Crow Indian reservation. He moved to arrest the judgment on the ground that the Federal court had no jurisdiction to try an offense committed on the Crow reservation by other than an Indian, as

such crime was exclusively punishable by the proper court of the state of Montana. The lower court refused to arrest the judgment, and an appeal was taken to the supreme court.

The treaty creating the Crow reservation, made after the organization of Montana territory, contained no stipulation restricting the power of the United States to include the land embraced within the reservation in any state or territory then existing, or which might thereafter be created, the stipulation being that the reservation should be

". . . set apart for the absolute and undisturbed use and occupation of the Indians herein named . . . ; and the United States now solemnly agrees that no persons, except those herein designated and authorized so to do, and except such officers, agents, and employés of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for use of said Indians . . . " (15 Stat. 649, 650.)

The court stated the question to be:

"Has the State of Montana jurisdiction over offences committed within its geographical boundaries by persons not Indians or against Indians, or did the enabling act deprive the courts of the State of such jurisdiction of all offences committed on the Crow Indian reservation, thereby divesting the State *pro tanto* of equal authority and jurisdiction over its citizens, usually enjoyed by the other States of the Union?"

Chief Justice White, after reviewing the course of congressional legislation on the subject, stated that, whenever, upon the admission of a state into the Union, Congress had intended to except out of it an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express words, and continues:

"As equality of statehood is the rule, the words relied on here to create an exception cannot be construed as doing so, if, by any reasonable meaning, they can be otherwise treated. The mere reservation of jurisdiction and control by the United States of 'Indian lands' does not of necessity signify a retention of jurisdiction in the United States to punish all offences committed on such lands by others than Indians or against Indians. It is argued that as the first portion of the section in which the language relied on is found, disclaims all right and title of the State to 'the unappropriated public lands lying within the boundaries thereof and of all lands lying within said limits, owned or held by an Indian or Indian tribes, and until the title thereof shall be extinguished by the United States, the same shall be and remain subject to the disposition of the United States,' therefore the subsequent words 'and said lands shall remain under the absolute jurisdiction and control of the United States,' are rendered purely tautological and meaningless, unless they signify something more than the reservation of authority of the United States over the lands themselves and the title thereto. This argument overlooks not only the particular action of Congress as to the Crow reservation, but also the state of the general law of the United States, as to Indian reservations, at the time of the admission of Montana into the Union."

Holding that the state courts had exclusive jurisdiction of the trial of an offense committed on the reservation by a non-Indian upon a non-Indian, the opinion concludes:

"It follows that a proper appreciation of the legislation as to Indians existing at the time of the passage of the enabling act by which the State of Montana was admitted into the Union adequately explains the use of the words relied upon and demonstrates that in reserving to the United States jurisdiction and control over Indian lands it was not intended to deprive that State of power to punish for crimes committed on a reservation or Indian lands by other than Indians or

against Indians, and that a consideration of the whole subject fully answers the argument that the language used in the enabling act becomes meaningless unless it be construed as depriving the State of authority to it belonging in virtue of its existence as an equal member of the Union."

The compact with the United States contained in Art. XXVI of our state constitution pledges the state not to tax unemancipated Indians or their property. It contains no provision against taxing non-Indians subject to the state's jurisdiction, even though doing business under license within an Indian reservation. The taxes involved here are sought to be collected only in respect of business transacted with, and sales made to, persons other than Indians.

Appellants' other contention is that the state's levy of the taxes sought to be collected here interferes with, and places a burden upon, a Federal instrumentality and upon commerce with the Indians.

Even if it be assumed that the appellants are instrumentalities of the Federal government in so far as they transact business with the Indians, we are unable to see how their duties or obligations to the Government are in any way interfered with by the exaction of the challenged taxes, nor do we see how the taxes in any way hamper commerce with the Indians.

The judgment is affirmed.

BLAKE, C. J., BEALS, JEFFERS, and STEINERT, JJ., concur.