[No. 29407. *En Banc.* February 24, 1945.]

JOHN A. BENNETT *et al., Respondents,* v. THE CITY OF
SEATTLE, *Appellant.*[1]

*A. C. Van Soelen* and *Arthur Schramm,* for appellant.

*William A. Shanafelt* and *Rummens & Griffin,* for respondents.

GRADY, J.—This action was brought by John A. Bennett and Sarah Ann Bennett, his wife, against the city of

[1] Reported in 156 P. (2d) 685.

Seattle to recover damages for injuries sustained by Mrs. Bennett by reason of her having been struck by a bus, alleged to have been negligently operated by one of its employees. The jury before which the case was tried returned a verdict for the plaintiffs, and, from the judgment entered thereon, the defendant has taken an appeal. Mrs. Bennett will be referred to in this opinion as though she were the sole respondent.

The material facts presented to the jury were substantially as follows: East Marginal way was a public street within the limits of the city of Seattle and ran in an easterly and westerly direction. Sixteenth avenue south was also a public street and ran in a northerly and southerly direction. The part of Sixteenth avenue from Marginal way south to the Duwamish river bridge is involved in the case before us. At the trial it was stipulated as follows:

"I

"That in December, 1941, the United States Army closed 16th Avenue South from East Marginal Way to the south side of the bridge crossing the Duwamish river to public use and travel and stationed armed guards to prohibit such use at the south end of the bridge across the Duwamish river and on East Marginal Way west of the intersection of 16th Avenue South with East Marginal Way.

"II

"That said closing and said guards were being maintained as aforesaid on February 24, 1943.

"III

"That the busses of the city were permitted to use said 16th Avenue South as well as the Des Moines busses and Boeing workers carrying proper permits."

The Boeing Aircraft Company operated a plant devoted to the manufacture of airplanes for the use of the United States army, and it was located in the area south of east Marginal way and east of Sixteenth avenue south. There was an exit from the plant used by women employees and by which they reached Sixteenth avenue. There was no sidewalk along Sixteenth avenue from the exit to east Marginal way. The busses carrying employees from this part of the plant would line up along a wooden rail on Six-

teenth avenue, a short distance from the exit. To the north of the exit was a space where employees parked their automobiles.

About three o'clock in the afternoon of February 24, 1943, a shift came off duty and a large number of the employees went on to Sixteenth avenue to enter either waiting busses or go to the parking lot. The respondent and another employee proceeded on foot north on the east side of Sixteenth avenue, intending to go to the parking lot. One of appellant's busses, traveling north on Sixteenth avenue, collided with the respondent, causing her to be injured.

There was some conflict in the testimony as to whether the bus ran against the respondent or she contacted it, but the jury accepted the respondent's version as to how the collision took place.

The assignments of error of appellant present two questions for the court to decide: (1) the effect, if any, of the action of the war department of the United States in closing Sixteenth avenue upon the application of Rem. Rev. Stat., Vol. 7A, § 6360-101 [P. C. § 2696-859]; and (2) whether the trial court erred in rejecting testimony claimed to be a part of the *res gestae.*

The Washington motor vehicle act, chapter 189 of the Laws of 1937, p. 835, Rem. Rev. Stat., Vol. 7A, § 6360-1 [P. C. § 2696-767], *et seq.,* is a comprehensive enactment, prescribing among other things rights, obligations, and duties of users of the public highways. For the purposes of the act, a public highway is defined by § 1, subd. (qq), p. 841, Rem. Rev. Stat., Vol. 7A, § 6360-1, to be "Every way, lane, road, street, boulevard, and every way or place in the State of Washington open as a matter of right to public vehicular travel both inside and outside the limits of incorporated cities and towns."

By § 1, subd. (11), p. 840, Rem. Rev. Stat., Vol. 7A, § 6360-1, subd. (11), a pedestrian is defined to be "Any person afoot."

Section 101, p. 904, of the act, Rem. Rev. Stat., Vol. 7A, § 6360-101, defines the duties of a pedestrian as follows:

"Pedestrians on any public highway where a sidewalk is provided shall proceed upon such sidewalk. Pedestrians on any public highway where no sidewalk is provided shall proceed on the extreme left-hand side of the roadway and upon meeting an oncoming vehicle shall step to their left and clear of the roadway."

It will thus be seen that, if the rule of the road just referred to was applicable to the situation disclosed, the respondent was negligent as a matter of law and that such negligence contributed to her injuries and was a proximate cause thereof.

The highway was closed to general public travel in December, 1941. Public authority acquiesced in the action taken by the army officers. The appellant does not question the right and power of the officers of the army to close the part of Sixteenth avenue from east Marginal way to the bridge to public travel and to admit into the closed area only such busses and automobiles of employees of the Boeing plant as they deemed advisable; but it contends that, notwithstanding this, such part of Sixteenth avenue did not cease to be a public highway and that the statutory rules of the road still applied.

We think it is true that the highway did not cease to be such in the sense that the public easement was extinguished or that it was abandoned by the public or the municipality, or that the municipality or the county or state lost or surrendered jurisdiction over it. If a crime penalized by statute or ordinance had been committed in the enclosed area, the state or city still had the right to try and punish the offender. It was its use as a public highway that was changed. There had been a suspension of its use for public vehicular travel, and it was no longer "open as a matter of right" for such travel during such time as the war department kept its closure order in force.

Police regulations, like § 101 of the act, Rem. Rev. Stat., Vol. 7A, § 6360-101, are enacted for the safety of those having reciprocal rights in the use of public highways. If this

statute is obeyed, the pedestrian is protected against vehicles coming behind him, and he has full opportunity to observe those he meets and to step aside and allow them to pass. But the use of a highway may be so changed that it is not only impracticable to observe such a rule of the road, but to do so would tend to increase the hazard.

When the various shifts changed, a large number of people surged back and forth in the area where the busses loaded and employees went to get their automobiles. Witnesses compared the situation to an active ant hill or what usually takes place at the close of a baseball game. If the respondent had attempted to obey the statute, she would have been obliged to have made her way through a crowd of people to get across to the west side of Sixteenth avenue, and, when she reached the parking area, would then cross to the east side. In view of the conditions existing, it was necessary for the driver of a bus slowly to work the bus through the pedestrian traffic until it had cleared the same.

Counsel for the respective parties informed us that they had not found any case adjudicating the question now before the court, and we have not been able to do so. Certain analogies have been suggested, but they do not fit the situation, and to discuss and attempt to apply them would confuse rather than clarify. The situation is a new and novel one, and we must resort to common-law principles of law to furnish a guide to the conduct of both parties to this case.

The action taken in closing the highway to public use did not infringe upon, or interfere with, the exercise of any prerogative of sovereignty or any governmental function of the state or its legal subdivisions. The appellant, in maintaining its streets, acts in a proprietary capacity, and it acquired no right in a statutory rule of conduct by a pedestrian on the highway that would prevent its temporary suspension when such became necessary or convenient by an exercise of a war power of the kind we are now considering.

We have reached the conclusion that the respondent was not negligent as a matter of law in walking north

along the east side of Sixteenth avenue at the place and time she was injured, and that, in view of the change in use of the highway, her conduct must be measured by her common-law duty to have exercised ordinary and reasonable care for her own safety. The jury by its verdict found that she met this duty, and its verdict must be treated as conclusive.

One of the witnesses called by appellant was Edna Hodges, one of the employees and a passenger on the bus. She was asked, "At, or immediately after, the impact, did you hear any remark made by a passenger on the bus?" An objection to the question was sustained by the court. An offer was made to prove by the witness that, at the time stated, she had heard a passenger on the bus exclaim, " 'Why, that woman walked right into the bus,' " the theory of appellant being that the exclamation was a part of the *res gestae*. The court rejected the offer, being of the opinion that to permit the witness to repeat the exclamation would be relating "a statement of some third person to some conclusion arrived at at that time."

In *Beck v. Dye*, 200 Wash. 1, 92 P. (2d) 1113, 127 A. L. R. 1022, we set forth the tests which a statement or declaration must meet in order to be admitted as a part of the *res gestae*, and, without again repeating them here, it is our opinion that the proffered exclamation met those tests and that it was error to reject the offer of proof.

Evidence tending to establish the fact that the respondent, by her own act, collided with the bus was very material, and a new trial must be awarded if it may properly be said that the error was so prejudicial that, had the testimony been received, the jury probably would have returned a different verdict.

The testimony as to whether the bus swerved and struck the respondent or whether she swerved and walked against the bus was in direct conflict. When the driver of the bus was testifying, he said:

"I had moved ahead, as I said, one and a half bus lengths and I heard an impact on the side of the coach, a definite impact. Right at the second I paid no attention. Someone

inside, along side me, someone rapped on the window. After that I heard a scream and someone stated someone had walked into the side of the bus and was hurt. All that was just like that, the impact, the scream and the remark, were all together."

We think it must be inferred that this witness was speaking of the same person that the witness Edna Hodges referred to.

■ When an appellate court is considering a question of prejudicial error of the kind now before us, it must of necessity review all the evidence relating to that which the rejected testimony relates; and, if it appears from the record that the same, or substantially the same, evidence was given to the jury, then it can and should say that the error was not prejudicial. We have applied this rule many times, and the following are some of the cases: *Brown v. Seattle,* 57 Wash. 314, 106 Pac. 1113; *Klodek v. May Creek Logging Co.,* 71 Wash. 573, 129 Pac. 99; *Seattle, P. A. & L. C. R. v. Land,* 81 Wash. 206, 142 Pac. 680; *Shilliam v. Newman,* 94 Wash. 637, 162 Pac. 977; *Bredemeyer v. Johnson,* 179 Wash. 225, 36 P. (2d) 1062. These cases are factually different from the one before us, but they recognize the principle of law applicable to the question here involved.

It is argued by appellant that, as the witness who testified to the exclamation was the driver of the bus, he was an interested witness and the jury, in all probability, did not give his testimony the weight it would have given to the same statement coming from a disinterested witness, as was Edna Hodges.

We do not think this assumption can be indulged in by us to such an extent we should say that, had Edna Hodges been permitted to repeat the exclamation, the verdict would probably have been different. It appears to us from the record as a whole that the issue was presented to the jury with such fullness and clarity by both parties we cannot say that, had the proffered testimony been received, it probably would have changed the result, and we, therefore, conclude that the error was not so prejudicial as to warrant a reversal of the judgment.

We are fortified in our conclusion by reason of §§ 307 and 1752 of Rem. Rev. Stat. [P. C. §§ 8340, 7336], by which we have been directed, when reviewing a case on appeal, to disregard all technicalities and consider the case on its merits; also, to disregard any error in the proceedings taken in the case which will not affect the substantial rights of a party. A refusal by a trial court to receive competent and material evidence may or may not affect a substantial right. It all depends upon the nature and character of the evidence and its bearing on the case viewed in its entirety. Each case must depend upon its own circumstances when the appellate court is called upon to determine the effect of an error in excluding evidence.

The judgment is affirmed.

BLAKE and MALLERY, JJ., concur.

STEINERT, J. (concurring in the result)—I concur with the majority on the question of the effect of the action of the war department of the United States in closing the street. On the second question, relating to the rejection of evidence concerning an exclamation by a passenger in the bus, I am of the opinion that the offered evidence was merely cumulative. At least three witnesses, other than the driver, testified that the respondent walked into the bus. Testimony as to a mere exclamation to the same effect by an unknown person would have added nothing to the appellant's case, and certainly its exclusion should not be held sufficient, under these circumstances, to constitute reversible error.

I agree that the judgment should be affirmed.

ROBINSON, J., concurs with STEINERT, J.

SIMPSON, J. (dissenting)—I am unable to agree with the majority opinion. The fact that an injury occurred is no occasion to hold the appellant responsible. I sympathize with anyone who has been injured, however the questions to be determined are ones of law and call for the application of strict legal principles to the determination of these problems. I feel that we should bring to bear a judgment that is cool, calculating, fearless, and deliberate, uninfluenced by

any emotion of sympathy, untrammeled by any anxiety of fear as to the result. It is on this foundation that I discuss the problems presented for consideration in this case.

The majority concede that the highway upon which the accident occurred is a public highway and it did not cease to be such in the sense "that the public easement was extinguished or that it was abandoned by the public or the municipality, or that the municipality or the county or state lost or surrendered jurisdiction over it." No reason is given for holding that the state retained jurisdiction over the highway for some purposes, but surrendered it for other purposes.

I am unable to ascertain any good reason for extending to the users of the highway an exemption from obedience to the rules of the road which should govern all who use it. The question is: Did the state lose or surrender the right to enforce the rules of the road when the Federal government, by force and without sanction of any statute, state or Federal, closed the highway to all traffic except to those persons working at the Boeing plant?

It is quite evident that Mrs. Bennett was guilty of contributory negligence in walking in a northerly direction on the right side of the highway if the laws of this state were in operation at the time she was injured. This statement is borne out by the following cases: *Benson v. Anderson,* 129 Wash. 19, 223 Pac. 1063; *Keller v. Breneman,* 153 Wash. 208, 279 Pac. 588, 67 A. L. R. 92; *Turner v. Good,* 167 Wash. 27, 8 P. (2d) 414; *Steen v. Hedstrom,* 189 Wash. 75, 63 P. (2d) 507; *Flaumer v. Samuels,* 4 Wn. (2d) 609, 104 P. (2d) 484.

There are no provisions in our constitution or statutes which provide that any law of this state may be set aside or temporarily suspended or repealed by an act other than that of the legislature.

There are certain principles or rules announced which aid us in arriving at the conclusion that the taking over of state property does not suspend the laws governing that property.

A case bearing upon the question as to continued jurisdiction of the state is *Ryan v. State,* 188 Wash. 115, 61 P. (2d) 1276. In that case it appears that two actions were involved; one for the refund of money paid as an occupation tax, and, second, for an injunction to prevent further collections of the tax. In this case we laid down the rule as to how lands within the jurisdiction of the state may become subject to the exclusive jurisdiction of the Federal government. The rule is as follows:

"(1) When the land is acquired for one of the purposes within Art. I, § 8, clause 17 [of the Federal Constitution], by purchase with consent of the state, Federal jurisdiction is exclusive in such area for all purposes; (2) when the land is acquired for one of the purposes within that clause, but other than by purchase with the consent of the state, then Federal jurisdiction is exclusive only to the extent of the purposes for which the land is held; (3) when the land is acquired for a purpose not within that clause, but by purchase with the consent of the state, then the United States has such jurisdiction over the land as may be ceded to it by the state; and (4) when the land is acquired for a purpose not within that clause, in any manner other than by purchase with the consent of the state, then the United States holds the land just as any other proprietor does, except that the land may not be taxed by the state."

That case, *Ryan v. State, supra,* and the case of *Mason, Inc. v. State Tax Commission,* 188 Wash 98, 61 P. (2d) 1269, were appealed to the United States supreme court, and in an opinion in the consolidated cases, *Silas Mason Co. v. Tax Commission,* 302 U. S. 186, 82 L. Ed. 187, 58 S. Ct. 233, were affirmed. In passing upon the questions presented, the supreme court used the following language:

"These contracts with appellants were made in full appreciation of the inevitable creation, through the carrying out of this project, of a large local community within the area acquired by the United States, with residents whose needs could be suitably served by the administration of the laws of the State without interfering in any way with the execution of the federal plan. School facilities were to be, and have been, provided by arrangements with the local authorities. Police protection was to be, and has been, assured by co-operation with the State Patrol. Cognizance

of crimes committed within the area has been taken by local prosecutors and judicial officers. It is futile to say that these local authorities became federal authorities *pro hac vice*, for the contracts which have been ratified by Congress manifestly contemplated action by the local officers as representatives of the State and as acting in the exercise of state jurisdiction.

"Our conclusion is that the State had territorial jurisdiction to impose the tax upon appellants' receipts and that the tax does not lay an unconstitutional burden upon the Federal Government."

*State ex rel. Grays Harbor Const. Co. v. Department of Labor & Industries,* 167 Wash. 507, 10 P. (2d) 213, involved the question as to whether the workmen's compensation act of this state was in force within the boundaries of Rainier national park. This court reviewed the history of the acts relating to the formation of the park and the passage of our compensation act, and called attention to the fact that this state had not ceded jurisdiction of the land within the park until five years after the passage of the industrial insurance act. The jurisdiction of the Federal government was acquired through consent of the state. After citing quotations from other authorities, we stated:

"From the authorities cited and the excerpts from two of them quoted, it follows that, the workmen's compensation act having been in force within the territorial boundaries of Rainier national park at the time jurisdiction thereof was ceded to the United States, the act remained in force until Congress passed an act which superseded it. Up to the present time, no act of Congress has been passed which is in any respect inconsistent with the operation of the workmen's compensation act over the park."

In passing, it is proper to call attention to the case of *Murray v. Gerrick & Co.*, 172 Wash. 365, 20 P. (2d) 591. The same case is 291 U. S. 315, 78 L. Ed. 821, 54 S. Ct. 432, 92 A. L. R. 1259, in which it was held that our insurance act did not extend to the Puget Sound navy yard. Our decision and that of the United States supreme court were grounded upon the fact that the compensation act was

adopted many years after this state had surrendered its jurisdiction over the property acquired by the navy.

In *Neah Bay Fish Co. v. Krummel*, 3 Wn. (2d) 570, 101 P. (2d) 600, this court had before it the question of whether the state could collect the sales tax upon firms doing business within the Makah Indian reservation under authority and license from the commissioner of Indian affairs. The business was done with, and sales made to, persons other than Indians. This court held that, although the United States government had exclusive control of the Indians and their reservation, this state had the right to impose a tax. In considering the question, we had occasion to refer to the case of *Draper v. United States*, 164 U. S. 240, 41 L. Ed. 419, 17 S. Ct. 107. That case has such a close bearing upon this one by analogy that I quote what was said of it in the *Krummel* case:

"In *Draper v. United States*, 164 U. S. 240, 41 L. Ed. 419, 17 S. Ct. 107, the plaintiff in error had been indicted, tried, convicted, and sentenced to death by the circuit court of the United States for the district of Montana, for the crime of murder, alleged to have been committed on the Crow Indian reservation. He moved to arrest the judgment on the ground that the Federal court had no jurisdiction to try an offense committed on the Crow reservation by other than an Indian, as such crime was exclusively punishable by the proper court of the state of Montana. The lower court refused to arrest the judgment, and an appeal was taken to the supreme court.

"The treaty creating the Crow reservation, made after the organization of Montana territory, contained no stipulation restricting the power of the United States to include the land embraced within the reservation in any state or territory then existing, or which might thereafter be created, the stipulation being that the reservation should be

" ' . . . set apart for the absolute and undisturbed use and occupation of the Indians herein named . . . ; and the United States now solemnly agrees that no persons, except those herein designated and authorized so to do, and except such officers, agents, and employees of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the terri-

tory described in this article for use of said Indians . . .'
(15 Stat. 649, 650.)

"The court stated the question to be:

" 'Has the State of Montana jurisdiction over offenses committed within its geographical boundaries by persons not Indians or against Indians, or did the enabling act deprive the courts of the State of such jurisdiction of all offences committed on the Crow Indian reservation, thereby divesting the State *pro tanto* of equal authority and jurisdiction over its citizens, usually enjoyed by the other States of the Union?'

"Chief Justice White, after reviewing the course of congressional legislation on the subject, stated that, whenever, upon the admission of a state into the Union, Congress had intended to except out of it an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express words, and continues:

" 'As equality of statehood is the rule, the words relied on here to create an exception cannot be construed as doing so, if, by any reasonable meaning, they can be otherwise treated. The mere reservation of jurisdiction and control by the United States of "Indian lands" does not of necessity signify a retention of jurisdiction in the United States to punish all offenses committed on such lands by others than Indians or against Indians. It is argued that as the first portion of the section in which the language relied on is found, disclaims all right and title of the State to "the unappropriated public lands lying within the boundaries thereof and of all lands lying within said limits, owned or held by an Indian or Indian tribes, and until the title thereof shall be extinguished by the United States, the same shall be and remain subject to the disposition of the United States," therefore the subsequent words "and said lands shall remain under the absolute jurisdiction and control of the United States," are rendered purely tautological and meaningless, unless they signify something more than the reservation of authority of the United States over the lands themselves and the title thereto. This argument overlooks not only the particular action of Congress as to the Crow reservation, but also the state of the general law of the United States, as to Indian reservations, at the time of the admission of Montana into the Union.'

"Holding that the state courts had exclusive jurisdiction of the trial of an offense committed on the reservation by a non-Indian upon a non-Indian, the opinion concludes:

" 'It follows that a proper appreciation of the legislation as to Indians existing at the time of the passage of the enabling act by which the State, of Montana was admitted into the Union adequately explains the use of the words relied upon and demonstrates that in reserving to the United States jurisdiction and control over Indian lands it was not intended to deprive that State of power to punish for crimes committed on a reservation or Indian lands by other than Indians or against Indians, and that a consideration of the whole subject fully answers the argument that the language used in the enabling act becomes meaningless unless it be construed as depriving the State of authority to it belonging in virtue of its existence as an equal member of the Union.' "

From these decisions we find that the state has jurisdiction over the lands within its borders which belong to the Federal government in civil and criminal actions, unless the state has ceded its jurisdiction to the Federal government.

In this case it is not shown that the state of Washington surrendered its jurisdiction over the highway upon which the accident occurred. It follows that the rules of the road adopted by our legislature were in full force and effect at the time Mrs. Bennett was injured, and that she was guilty of contributory negligence as a matter of law.

The majority opinion is not consistent in that it holds that the state would have the right to punish an offender for violation of state laws and, at the same time, it says that those laws are not applicable when considered in a civil action. A most unusual situation would occur if a driver of an automobile exceeded the speed limit in the closed area and injured someone in so doing. Under the majority holding the driver could be punished in a criminal action, but his violation of the law could not be held negligent *per se*, thereby setting aside another one of our well-recognized rules.

The majority holds that the court committed error in not allowing the introduction of evidence relating to an exclamation made by a disinterested witness at the time the accident occurred. I agree with this holding, *Britton v. Washington Water Power Co.,* 59 Wash. 440, 110 Pac. 20,

140 Am. St. 858, 33 L. R. A. (N.S.) 109; *Heg v. Mullen,* 115 Wash. 252, 197 Pac. 51; *State v. Goodwin,* 119 Wash. 135, 204 Pac. 769, but disagree with the statement of the majority that this error was not reversible.

The majority holding, being based on the theory that the introduction of the evidence "probably would not have changed the result," to justify the startling new idea of guessing what a jury would do, have cited several cases. I call attention to the holding in those cases. The only reference made to the admission of evidence in *Brown v. Seattle,* 57 Wash. 314, 106 Pac. 1113, was:

"The second contention is that certain evidence offered on behalf of the appellants at the hearing in the superior court was improperly excluded, but we do not find that the record sustains this contention; the evidence offered, it is true, was excluded when first presented, but the court subsequently permitted it to be introduced. If any error was committed in excluding it when first offered, the error was cured by its subsequent admission."

In *Gasof v. Standard Ice Co.,* 71 Wash. 537, 129 Pac. 101, the only reference to error concerning evidence concerned the admission of a building permit given by the city to one of the defendants. This court held the permit admissible as a circumstance tending to show notice.

*Seattle, P. A. & L. C. R. v. Land,* 81 Wash. 206, 142 Pac. 680, was a condemnation proceeding tried to the court without a jury. An offer of proof was made relative to the commercial value of sand and gravel on the property condemned. An offer of proof was made by the owner of the property and the court allowed certain evidence to be introduced. In passing, this court stated: "The testimony admitted covered everything included in the offer."

The only other evidence related to the disputed value of the property taken and the effect the taking had upon the balance remaining to the owner.

The case of *Shilliam v. Newman,* 94 Wash. 637, 162 Pac. 977, involved an action for personal injuries. The trial court refused to admit a written instrument signed by plaintiff which was in the nature of a release. This court

held that the error, if any, was cured by the admission of evidence contained in the written instrument, "and the rejection of the written declaration cannot be held to prejudice appellants."

*Bredemeyer v. Johnson,* 179 Wash. 225, 36 P. (2d) 1062, was a personal injury case. The only reference to error predicated upon a rule concerning admission of evidence is contained in the following excerpt from the opinion:

"On cross-examination of respondent, the court sustained an objection to the following question: 'Supposing you were making a turn, how much shorter could you make a turn when he (the passenger) was not on there?' The question was pertinent to the issues, but we do not think the ruling was prejudicial, because the subject was later gone into. The court, subsequent to the ruling complained of, said:

" 'If the presence of this boy on the seat with the driver interfered with the operation of the car and was in any way a contributing cause of the accident it would be proper to show that if you can do so.'

"Pursuant to this observation, respondent was permitted to answer (among others of a similar import) the following question:

" 'How much effect did the fact that you had this boy right on the seat with you, how much effect did it have on your turn that you attempted to make to avoid the collision?' "

It will be seen that the cases in no way sustain the statement made by the majority. In none of them is there even a suspicion of a holding that the exclusion of admissible evidence would "probably" have not changed the verdict.

In *Britton v. Washington Water Power Co., supra,* this court reversed a judgment on the ground that the trial court refused to allow the admission of evidence which consisted of an exclamation made by a bystander at the time the accident occurred. In that case action was instituted to collect for personal injuries suffered when it was charged that a boy was kicked from a train by a conductor. The situation and ruling are shown by the following quotation from the opinion:

"One of the respondent's witnesses upon direct examination stated that, when the boy was observed riding upon the step, the conductor pulled the bell cord and started to open the door, when someone said, 'The boy is off!' This statement was stricken on motion of the respondent. The boy testified that, when he got onto the step, the door was closed, and that the conductor opened the car door and kicked him off. The appellant insisted at the time the statement was stricken, and insists here, that it was admissible as a part of the *res gestae*. The learned trial court, however, ruled that it was inadmissible. In this, we think, he committed prejudicial error. . . . The exclamation was so clearly a part of the *res gestae*, and·so vitally affected the issue to which it referred, that its rejection was highly prejudicial."

The above case is exactly in point. Rarely do we find cases where the factual situations are so entirely alike as they are in the cited case and the one at bar. The *Britton* case has never been overruled or distinguished. It is the law of this state and should govern the present case in so far as the introduction of evidence is concerned.

Another important phase of this case is the majority's dependence upon Rem. Rev. Stat., § 307 and § 1752, in which this court has been directed to decide cases in a certain way. Our state constitution provides for three independent departments of our state government, the legislative, the executive, and the judicial. There is no part or portion of the constitution which gives the legislature the right or power to compel the courts of this state to follow a legislative rule in deciding cases. Therefore, the legislature does not have the power to indicate or direct the manner in which cases in the court shall be decided. *Kilbourn v. Thompson,* 103 U. S. 168, 26 L. Ed. 377; *Blanchard v. Golden Age Brewing Co.,* 188 Wash. 396, 63 P. (2d) 397.

The majority opinion is evidently written to follow what is now known as the "modern trend," concerning which the California court, in *Guild v. Brown,* 115 Cal. App. 374, 1 P. (2d) 528, stated:

"It seems to be taken for granted in these times that the main thing in every case of accident is to find some one

able to respond to the claim of damage. And following this out the ancient doctrines of the law have been twisted and distorted in an endeavor to dole out damages to every unfortunate person injured, regardless of the true principles upon which liability rests."

This case should be reversed and dismissed on the ground that the respondent was guilty of contributory negligence. In any event, it should be sent back for a new trial.

MILLARD and JEFFERS, JJ., concur with SIMPSON, J.

BEALS, C. J. (dissenting)—In the case at bar it was stipulated that a portion of Sixteenth avenue south had been closed to public use by the United States army. Judicial notice may be taken of the fact that a large area containing the Boeing plant and including other public highways was also closed to the public by the military authorities.

By the act of the military authorities in establishing the restricted zone, the *use* of the highways within the area was not changed. The order merely prevented persons not having passes from entering the zone. Thousands of persons, many of them riding in automobiles, entered the area every day and left it at the close of some shift. Pedestrians who were permitted to enter the area used the streets, and motor vehicles and pedestrians while within the zone, were certainly bound to obey the laws of the road in force in the surrounding territory, and users of the highway violated such regulations at their peril. Certainly it could not be reasonably contended that as to all such persons using the highways the ordinary traffic laws were suspended.

The only basis, then, for holding that the laws of the road did not apply in the instant case is the fact that at the time and place of the accident a large number of persons were using the street in boarding city busses and other vehicles which would carry them to their homes, with the result that the street was crowded with pedestrians and some motor vehicles. In my opinion, if it should be held that respondent was not bound by the law of the road, it may only be so held because at the time of the accident many

people were using the street in locating and boarding motor vehicles of one sort or another. The existence of such a situation was not the result of the fact that the street was closed to the public, but resulted from a lack of adequate control of the crowd. The majority assume that the driver of the city bus was under the necessity of working his way through the pedestrian traffic. Certainly in so doing he was bound by the law of the road and would have been held negligent as matter of law had he proceeded along his left-hand portion of the highway.

While the situation presented was one of difficulty and required the exercise of great care by the driver of the bus, the obligation to use unusual care also rested upon all pedestrians, including respondent.

It is my opinion that the fact that the street was closed to ordinary traffic and its use limited to persons having passes permitting them to enter the area, has no bearing upon the question here to be decided; and I am convinced that under the circumstances shown respondent wife was under obligation to observe the traffic regulation in question.

I accordingly dissent from the conclusion reached by the majority.

MILLARD, J., concurs with BEALS, C. J.

---

March 31, 1945. Petition for rehearing denied.